**Tagged for publication**



**ORDERED in the Southern District of Florida on August 5, 2013.**

**John K. Olson, Judge**
**United States Bankruptcy Court**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                     Case No. 12-13989-JKO
                                                           Chapter 7
PETER G. HERMAN,

      Debtor.

_____/

CIB MARINE CAPITAL, LLC,                    Adv. Pro. No. 12-1785-JKO
as assignee of CIB Marine Bancshares, Inc.,
successor by merger to Citrus Bank, N.A.,
and KENNETH A. WELT, solely in his
capacity as chapter 7 trustee of the estate
of Peter G. Herman,

      Plaintiffs,

      v.

PETER G. HERMAN,

      Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this Adversary Proceeding, Plaintiffs, CIB Marine Capital, LLC, as assignee of CIB Marine Bancshares, Inc., successor by merger to Citrus Bank, N.A. ("CIB Marine") and Kenneth A. Welt, as the duly appointed, authorized, qualified and acting Chapter 7 Trustee ("Trustee Welt") for the bankruptcy estate of Peter G. Herman (the "Debtor"), object to and seek denial of the Debtor's discharge based upon intentional concealment of prepetition assets, nondisclosure of prepetition transfers and related false oaths.

For years prior to his bankruptcy filing, the Debtor acted as an originating Director and co-lead trial counsel in two separate contingency fee cases against The Home Depot U.S.A., Inc. (the "Home Depot Case") and Security Mutual Life Insurance Company of New York (the "Security Mutual Case"), respectively (collectively, the "Contingency Fee Cases"). The Debtor's trial victories in the Contingency Fee Cases, which occurred prior to the commencement of his Chapter 7 bankruptcy proceeding, resulted in the receipt of approximately $10 million in fees (the "10 Million Fee") by his law firm, Tripp Scott, P.A. ("Tripp Scott"), and ultimately in post-petition compensation to the Debtor in the amount of $2.7 million on account of, among other things, his prepetition services and his status as a Director of Tripp Scott. Although the record in this case reflects numerous prepetition communications in which the Debtor stated his expectation and belief that he was entitled to a substantial share in the $10 Million Fee, the Debtor's interest in the $10 Million Fee was not disclosed in any of the Debtor's submissions in his Chapter 7 bankruptcy case, including in his Schedules and Statement of Financial Affairs.

The Debtor's omissions in this regard must be juxtaposed with his obligations to CIB Marine, which held an approximately $4.5 million prepetition deficiency judgment against the

2

Debtor on account of his guarantee of a failed real estate loan, and was actively attempting to collect such debt at the time of the Debtor's bankruptcy filing, including through the garnishment of the Debtor's wages.  Taken together, the Court finds the evidence reflects a scenario where, as of the date of his bankruptcy filing, the Debtor fully expected to receive millions of dollars in earnings in the near term (which he ultimately did), but sought to shield those earnings from his largest creditor through his Chapter 7 bankruptcy filing and related non-disclosure in his bankruptcy Schedules.

For the reasons set forth below, the Court concludes that the Debtor's interest in the $10 Million Fee is property of the Debtor's bankruptcy estate, and concludes that the Debtor concealed his interest in the $10 Million Fee in his bankruptcy Schedules with the intent to hinder, delay or defraud Trustee Welt and his creditors, most particularly CIB Marine.  The Court further concludes that the Debtor committed false oaths or accounts in his bankruptcy Schedules and Statement of Financial Affairs relating to the $10 Million Fee.  Based upon the foregoing, the Debtor's discharge is denied.  Additionally, because the Court also concludes that the Debtor transferred money to his ex-wife within the year prior to the date on which he filed bankruptcy with the intent to hinder, delay or defraud his creditors, concealed such transfer, and also committed false oaths or accounts in his bankruptcy Schedules and Statement of Financial Affairs relating to such transfer, the Debtor's discharge is denied.

This Adversary Proceeding was tried before the Court on June 5 and 6, 2013 (the "Trial"). The Debtor testified at Trial, along with two of his colleagues, Edward J. Pozzuoli, Esq. ("Pozzuoli") and Alexander D. Brown, Esq. ("Brown"), both of whom are attorneys at Tripp Scott.

## I.  FINDINGS OF FACT[1]

The issues in this Adversary Proceeding, including the Plaintiffs' claims that the Debtor intentionally concealed his interest in the $10 Million Fee, are best understood by assessing the facts and the Debtor's state of mind as of the date he filed his Chapter 7 bankruptcy case, including as to his existing liabilities and anticipated earnings as a Director of the law firm of Tripp Scott. Accordingly, the discussion that follows: (i) begins by addressing the facts surrounding CIB Marine's prepetition judgment against the Debtor in the amount of approximately $4.5 million; (ii) next addresses the Debtor's rights to compensation as a Director of Tripp Scott as they existed and as he understood them as of the date of his bankruptcy filing; (iii) then discusses the Contingency Fee Cases, their resolution and the Debtor's $2.7 million bonus from the $10 Million Fee; and, (iv) sets forth the facts surrounding the Debtor's concealment of assets and improper transfers in connection with his Chapter 7 bankruptcy case, which form the basis for the Plaintiffs' request for denial of the Debtor's discharge pursuant to §§ 727(a)(2) and (a)(4).

### A.    CIB Marine's Prepetition Judgment Against the Debtor

In January 2007, the Debtor owned certain membership interests in Esquire Ventures, LLC, a Florida limited liability company ("Esquire").  In January 2007, Esquire obtained a loan from Citrus Bank in the principal amount of $6,787,500.00 (the "Esquire Loan").  The Esquire Loan was

---

[1]The findings of fact are derived from the *Joint Pretrial Stipulation* [ECF No. 86] (the "Pretrial Stipulation") and the testimonial and documentary evidence presented at Trial.  Pursuant to Local Bankruptcy Rule 9070-1, the Plaintiffs' Trial Exhibits were marked alphabetically and the Debtor's Trial Exhibits were marked numerically, and will be referred to using such markings. Plaintiffs' Exs. 1-28 were admitted into evidence at the beginning of the Trial, without any objection by the Debtor.  Thus, Exs. 1-28 were unencumbered by any evidentiary objection, admitted into evidence for all purposes and were given full weight at Trial.  The Debtor's Exs. A, C, D, E, and F were admitted into evidence at the beginning of the Trial.  The Debtor's Exs. B, G, and H were not admitted into evidence at Trial.

secured by, *inter alia*, a first mortgage encumbering real property owned by Esquire in Indian River County, Florida (the "Esquire Property").    On January 25, 2007, the Debtor executed an Unconditional Guaranty in favor of Citrus Bank guaranteeing the Esquire Loan (the "Debtor Guaranty").[2]  In the Debtor Guaranty, the Debtor waived the benefits of all exemptions except any homestead exemption.

On January 24, 2009, the Esquire Loan matured, and Esquire failed to pay the loan balance. On February 19, 2009, CIB Marine instituted an action in the Circuit Court for the 19th Judicial Circuit Court for Indian River County, Florida seeking to enforce the Esquire Loan and the Debtor Guaranty (the "Esquire Action").  On June 23, 2011, CIB Marine obtained a final judgment against Esquire, *inter alia*, foreclosing the mortgage encumbering the Esquire Property.  On December 6, 2011, the court in the Esquire Action conducted a hearing on CIB Marine's request for entry of a deficiency judgment against the Debtor.  The Debtor testified at Trial that he did not attend the hearing or oppose the request for a deficiency judgment because the deficiency amount was already established prior to the hearing.

On December 8, 2011, the Court in the Esquire Action entered a final judgment of deficiency in the amount of $4,569,464.48 against the Debtor (the "CIB Marine Judgment").  On March 6, 2013, the Fourth District Court of Appeal affirmed the CIB Marine Judgment.  On April 16, 2013, the Fourth District Court of Appeal denied the request for rehearing and rehearing *en banc*, and for a written opinion relating to the affirmance of the CIB Marine Judgment.

---

[2]The Debtor admitted at Trial that his signature appeared on the Debtor Guaranty, which was admitted into evidence at Ex. 11.  The Debtor Guaranty reflects a date of June 25, 2007, and no party introduced any evidence to the contrary at Trial concerning the date of execution of the Debtor Guaranty.

Prior to the Debtor filing bankruptcy, CIB Marine was the only creditor actively pursuing collection efforts against the Debtor.  On December 29, 2011, the court in the Esquire Action, at the request of CIB Marine, issued a Continuing Writ of Garnishment against Salary or Wages to Tripp Scott.

**B.      The Debtor and Tripp Scott**

**1.      The Debtor**

The Debtor is a practicing attorney, was admitted to the Florida Bar in 1982 and is "AV" rated by Martindale-Hubbell.  The Debtor is employed by and is a non-shareholder "Director" at Tripp Scott.  He has been employed by Tripp Scott since 1982.  The Debtor testified that he is a trial lawyer.  His areas of practice have included: (i) Intellectual Property Litigation; (ii) General Commercial Litigation (but, specifically excluding any matters relating to bankruptcy practice); (iii) Healthcare; and (iv) Personal Injury.  According to the Debtor's biography from Tripp Scott's website, a copy of which was admitted into evidence at Trial as Ex. 1, (i) the Debtor has represented Fortune 500 companies and several prominent Florida businesses; (ii) he has been successful in litigation claims that have resulted in significant changes in the law, specifically in the area of negligence law relating to pharmacists and prescription pharmaceuticals; and (iii)  he has served as chair as well as co-chair of the firm's litigation department.  The testimony at Trial also reflects that the Debtor is a former member of the Compensation Committee at Tripp Scott.

The Court concludes on the basis of his testimony and the entire record made at Trial that Mr. Herman is a highly skilled, experienced, and sophisticated trial lawyer.

On February 18, 2012 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 7 of Title 11 of the United States Code, which initiated the bankruptcy case from which this Adversary Proceeding arises.

### 2.    Tripp Scott and Director Compensation

Tripp Scott is a law firm, which is organized as a subchapter C corporation under Florida law.  Trial Tr. 127:5-8. Tripp Scott is structured in a manner such that the firm has only two actual shareholders, Norman Tripp and Dennis Smith, each of whom acts as a trustee of a voting trust which has beneficial ownership of all of the firm's shares.  The firm has several attorneys who are referred to as "Directors."  Because the firm has only two shareholders, it is an individual's status and performance as a Director within the firm, and not the ownership of shares, that provides a basis for sharing in firm profits.  Indeed, the Trial testimony of Tripp Scott's President and Director, Edward Pozzuoli, shows that: (i) ownership of actual shares is not a factor in compensation; (ii) all shares in the firm are held in trust for the benefit of all of Tripp Scott's Directors, including the Debtor; and (iii) the compensation package the firm has for Directors is, "by design," "performance driven."  *See* Trial Tr. 188:14-24, 189:25-190:16.

Directors at Tripp Scott do not have written employment agreements but instead receive a "compensation package" that consists of the payment of monthly salary throughout a fiscal year (described by Mr. Pozzuoli as the "two-thirds" portion of Director compensation) and "disbursements" based upon the satisfaction of "certain performance criteria" (described by Mr. Pozzuoli as the "one-third" portion of Director compensation), which are typically made in

December of each fiscal year.[3]  *See id.* at 186:5-18.  Director compensation is established by Tripp Scott's Compensation Committee, whose present members are Mr. Pozzuoli, Dennis Smith, Esq., James Scott, Esq. and Matt Zifrony. Esq., all of whom are Directors at Tripp Scott.

The Debtor's annual compensation for 2011 consisted of a $220,000.00 salary and a performance bonus in the amount of $65,000.00.  The Debtor's annual compensation for 2012 consisted of a $220,000.00 salary and a $115,000 performance bonus.[4]  The Debtor's 2012 compensation also included a significantly heightened additional performance bonus (which was paid to the Debtor postpetition) in the amount of $2.7 million on account of his interest in the $10 Million Fee, which, as discussed below, was awarded by the Compensation Committee pursuant to Tripp Scott's established procedures for such awards.

Mr. Pozzuoli's testimony at Trial reflects that the Compensation Committee is vested with the authorization to set Director compensation (salary and performance bonuses). The Compensation Committee's ultimate award of the amount of the performance bonus is done through its analysis of a Director's performance in terms of client generation and work revenue, along with consideration of various factors set forth in a document entitled "Goal #5," which was admitted into evidence as Ex. 6 and referred to in testimony at Trial.[5]  Mr. Pozzuoli's testimony at Trial and in reference to Goal #5 shows that, while the Compensation Committee may consider certain subjective factors,

---

[3]Tripp Scott is on a calendar year for accounting purposes, which means its fiscal year ends on December 31.  If Tripp Scott does not distribute all or substantially all of its cash on hand prior to the end of its fiscal year, tax consequences are triggered at the corporate level, which would result in a double taxation on the firm's income.

[4]This annual performance bonus was derived from the annual bonus pool at Tripp Scott.  The $115,000 bonus was in addition to the $2.7 million special bonus paid from the $10 Million Fee.

[5]From the face of it, the document referred to as Goal #5 appears to have been prepared some time in 1999.

including the opinions of other Directors, in determining the amount of a Director's performance bonus, the Committee focuses on numerous objective factors including a Director's "personal billing rate," "total dollars billed as client partner," "realization rate," "personal billable hours," and "client generation." *See* Ex. 6; Trial Tr. 192:8-193:15.

Although Mr. Pozzuoli testified that the Compensation Committee has discretion in setting the ultimate *amount* of total Director compensation, no testimony or document was admitted into evidence stating (or even suggesting) that the Compensation Committee could suspend or terminate the practice of awarding Director bonuses entirely, which Mr. Pozzuoli testified was part of Directors' "compensation package" and specifically designed to be "performance driven." Likewise, no testimony or document was admitted into evidence establishing that the Compensation Committee could decide to award a Director a bonus in the amount of zero dollars, or depart from the criteria considered by the Compensation Committee in awarding such bonuses, in those instances where there was money to disburse and the Director was alive and employed when the distribution was to occur. To the contrary, Mr. Pozzuoli expressly testified that, in the last ten years, other than for reasons of law firm finances (*i.e.*, instances where the firm lacked the money to make a bonus distribution to Directors), there had not been an occasion where a Director who was alive and employed with the firm at the time a bonus was awarded was denied a bonus. *See* Trial Tr. 213:20-214:10. Moreover, the Debtor testified that the last time he received a zero bonus at Tripp Scott was "probably in, it's either the early 2000s or late '90s." Trial Tr. 64:17-20. Finally, the documentary evidence introduced at Trial revealed that Tripp Scott did not fail to award any Director a bonus between 2008 and 2011.

    **C.**    **The Contingency Fee Cases**

### 1.    The Home Depot Case

The Debtor was co-lead trial counsel, along with Mr. Brown, for the plaintiff in the Home Depot Case, styled *Powell v. The Home Depot U.S.A., Inc.*, Case No. 07-80435-CIV-HURLEY/HOPKINS, which was before the Honorable Daniel T. K. Hurley, United States District Court Judge for the Southern District of Florida and United States Magistrate Judge James M. Hopkins.  The Debtor was on the ECF notice list in the Home Depot Case.  The Home Depot Case was tried before a jury.  On June 3, 2010, the court in the Home Depot Case entered an Amended Final Judgment in favor of the plaintiff against The Home Depot U.S.A., Inc. in the amount of $23,450,889.13 based upon a jury verdict (the "Home Depot Judgment"). The Debtor's level of personal involvement in the Home Depot Case decreased substantially after the case was tried.

On June 11, 2010, the defendants in the Home Depot Case appealed the Home Depot Judgment to the United States Court of Appeals for the Federal Circuit (the "Federal Circuit").  On November 14, 2011, the Federal Circuit affirmed the Home Depot Judgment.  On February 16, 2012, the Federal Circuit's Mandate was issued.  On February 22, 2012, the Federal Circuit's affirmance of the Home Depot Judgment and Mandate were entered on the docket in the Home Depot Case.  On March 1, 2012, nine business days after the Debtor's bankruptcy filing, Tripp Scott received $4,126,016 into its bank account as its fee from the Home Depot Case.

The Debtor and two other Directors at Tripp Scott originated the Home Depot Case at Tripp Scott and equally shared origination credit.  The plaintiff in the Home Depot Case retained Tripp Scott on a contingency fee basis.  The Debtor testified that in 2011 and 2012, he was aware of the terms of the contingency fee contract between Tripp Scott and the plaintiff in the Home Depot Case, Michael Powell.

10

### 2.    The Security Mutual Case

The Debtor was also co-lead trial counsel, along with Mr. Brown, for the plaintiffs in the Security Mutual Case styled *Member Services, Inc. v. Security Mutual Life Insurance Company of New York*, Civil Action No. 3:06-CV-1164 (TJM) (DEP), which was before the Honorable David E. Peebles, United States Magistrate Judge for the Northern District of New York.

The Security Mutual Case was filed on September 29, 2006, by another law firm. Tripp Scott was substituted as counsel of record for the plaintiffs in the Security Mutual Case on November 4, 2010. The Debtor was on the ECF notice list in the Security Mutual Case. The Security Mutual Case was also tried before a jury. On October 13, 2011, the Clerk of the Court in the Security Mutual Case entered judgment in favor of the plaintiffs against Security Mutual Life Insurance Company of New York and Archway Technology Services, Inc. in the amount of $26,000,000 based upon a jury verdict, which consists of $16,000,000 in compensatory damages and $10,000,000 in punitive damages (the "Security Mutual Judgment"). The defendants in the Security Mutual Case did not appeal the Security Mutual Judgment. The Debtor's level of personal involvement in the Security Mutual Case decreased substantially after the case was tried.

The Debtor executed a satisfaction of the Security Mutual Judgment on March 13, 2012, which states that the Security Mutual Judgment had been fully paid to the satisfaction of the plaintiffs. On March 13, 2012, 17 business days following the Debtor's bankruptcy filing, Tripp Scott received $5,796,000.00 into its bank account as its fee in the Security Mutual Case.

The plaintiffs in the Security Mutual Case retained Tripp Scott on a contingency fee basis. The Debtor and Brown equally shared origination credit[6] on the Security Mutual Case. The Debtor

---

[6] See Footnote 7 below.

testified that in 2011 and 2012 he was aware of the terms of the contingency fee contract between Tripp Scott and the plaintiffs in the Security Mutual Case, Member Services and Roger and Aaron Banks.

### D.    The Debtor's Prepetition Communications Regarding His Interest in the $10 Million Fee

In the months prior to the Petition Date, the Debtor engaged in e-mail communications with Mr. Pozzuoli (Tripp Scott President and Compensation Committee member) and Mr. McLaughlin (Tripp Scott CFO and co-originator of the Home Depot Case) concerning dividing the $10 Million Fee.  These e-mail communications: (i) establish that on the Petition Date the Debtor believed he was entitled to millions of dollars in compensation from the $10 Million Fee based upon his prepetition interest in the fee; and (ii) contradict the Debtor's suggestions that prior to and on the Petition Date he believed he had no interest in the $10 Million Fee.  Based upon these e-mail communications, which are discussed below, the Court finds the Debtor believed, and reasonably so, he had a substantial interest in the $10 Million Fee on the Petition Date.

### 1.    The Pozzuoli Prepetition E-mails

The Debtor's e-mails from December 2011 through January 2012 are the most probative evidence introduced at Trial of the Debtor's state of mind concerning his prepetition interest in the $10 Million Fee from the Contingency Fee Cases.  The Debtor initiated an e-mail dialogue with Mr. Pozzuoli on December 6, 2011, regarding the $10 Million Fee, which continued through January 9, 2012 (the "Pozzuoli Prepetition E-mails").  The Pozzuoli Prepetition E-mails, which were admitted into evidence at Ex. 2, demonstrate: (i) the Debtor believed that he possessed a substantial interest in the $10 Million Fee prior to and on the Petition Date; (ii) based upon such interest, he

12

reasonably anticipated that he was going to receive a multi-million dollar bonus in 2012 from the $10 Million Fee; (iii) Mr. Pozzuoli did not contradict the Debtor's belief concerning his interest in the $10 Million Fee; and (iv) the members of Tripp Scott were engaged in prepetition discussions regarding dividing the $10 Million Fee among the firm's Directors.

Some of the more significant statements by the Debtor include the following:

- On December 6, 2011, at 5:17 p.m., the Debtor wrote to Mr. Pozzuoli and stated, "I wanted to discuss and finalize the formula for allocation[7] of the Sml and home depote [sic] cases. I know there has been a lot of discussion and for many reasons I would like to have finality by next Friday."[8] Ex. 2, PGH (2) - 000157.

- On December 15, 2011, the Debtor wrote to Mr. Pozzuoli at 8:16 a.m, expressing that it was unacceptable that Mr. Pozzuoli was not answering his e-mails and that second and third-year partners were being told more than he was with respect to the anticipated $10 Million Fee. Ex. 2, PGH (2) 00158. Indeed, the Debtor informed Mr. Pozzuoli, "You should know that from my standpoint my mind is pretty much made up concerning this issue and the firm should not waste so much time in coming up with formulas or continue to solicit opinions from partners who have no clue about these cases and the circumstances surrounding them." *Id.* He also stated that he expected that the issue would have been resolved prior to the Firm's lunch on December 16, 2011. *Id.* The Debtor concluded this communication by stating: "I hope you can understand my frustration and disappointment that the people who procured the 10 million dollars are being kept out of the loop." *Id.*

---

[7]It is clear from the Debtor's testimony that "allocation" meant the allocation of origination credit for the contingent fee cases, not the allocation of dollars from the fees ultimately paid to Tripp Scott.

[8]The Debtor testified that when he wrote to Mr. Pozzuoli on December 6, 2011, at 5:17 p.m., he knew what the gross fees were to be awarded to Tripp Scott under the contingency fee contracts in the Contingency Fee Cases based upon the final judgments entered in those two cases and the terms of the respective contingency fee contracts. The Debtor testified that his general understanding was that the gross fees to be awarded to Tripp Scott in the Contingency Fee Cases was approximately $10 million dollars, which is very close to what Tripp Scott was ultimately awarded.

13

- On December 15, 2011, the Debtor wrote a further email to Mr. Pozzuoli at 4:11 p.m., in which he referenced a meeting among himself, Mr. Pozzuoli and Mr. Brown, and applied what he claimed was the "formula considered by the comp committee and suggested by Dennis [Smith]," and allocated actual dollar amounts from the aggregate of the $10 Million Fee and the estimated 2011 bonus pool in the amount of $2.5 million to eighteen Tripp Scott Directors, including a proposed allocation of approximately $5.2 million for himself and Mr. Brown.  Ex. 2, PGH (2) – 000159-61.

- On December 22, 2011, at 4:36 p.m., the Debtor sent a further email to Mr. Pozzuoli, noting the following with regard to his interest in the $10 Million Fee:  "Also Eddie, I don't want to sound like a broken record but I was extremely serious that this should be resolved today. I believe this has been vetted enough and it's a simple process based upon what has been done in the past."  Ex. 2, PGH (2) – 00163.[9]

- On January 8, 2012, the Debtor wrote to Mr. Pozzuoli at 5:47 a.m., and, in referring to his interest in the $10 Million Fee, stressing that he did not "wish to wait until the money comes in and then begin discussions," and further noting the he "was told before the Holidays that we could likely address the resolution of this by the first week of January."  Ex. 8.

The foregoing statements contradict the Debtor's testimony at Trial that he believed he had no prepetition interest in the $10 Million Fee because Tripp Scott had not yet collected those proceeds on the Petition Date.  Further, the foregoing communications between the Debtor and Mr. Pozzuoli do not contain a single exchange in which Mr. Pozzuoli indicated that the Debtor was not entitled to a performance-based bonus on account of the Contingency Fee Cases or could be denied any such bonus at the sole discretion of the Compensation Committee. Indeed, rather than challenging the Debtor's position regarding his right to a performance bonus under the firm's

---

[9]The Court finds that this e-mail communication reveals how significant dividing the $10 Million Fee was to the Debtor prior to the Petition Date.  The Court infers from this e-mail that the Debtor had been thinking about his distribution from the $10 Million Fee virtually every day since at least December 6, 2011, when he commenced the Pozzuoli Prepetition E-mails.

14

compensation system, Mr. Pozzuoli's responses to the Debtor's communications focused on logistical concerns, noting, for example, that "there needs to be some money set aside for non directors/staff from both cases," Ex. 2, PGH (2) – 00162, and seeking additional information regarding the anticipated timing of the firm's receipt of fees from the Contingency Fee Cases. *Id.* at PGH (2) – 00166.

With regard to Mr. Pozzuoli's latter inquiry regarding the receipt of fees, on January 9, 2012, the Debtor informed Mr. Pozzuoli that "HD should be resolved in the next 60 days if not sooner now that the judges are back from the holidays." *Id.* at PGH (2) – 000167.  Consistent with the Debtor's representations, the record reflects that Tripp Scott received the award from the Home Depot Case less than sixty days from January 9, 2012.

With regard to fees in the Security Mutual Case, the Debtor advised Mr. Pozzuoli on January 9, 2012, as follows: "We are working out the final details.  *I believe I have complete control over when we receive the settlement funds and, in fact, I could have had that money before the end of the year; however, in talking with Greg and the client, it was better to push it into this year for tax reasons.*"[10]  *Id.* (emphasis added).  When this statement is analyzed in the context of the Brown Settlement E-mails, which are discussed below, the Court finds that the Debtor believed on January 9, 2012, he did have complete control over the resolution of the Security Mutual Case.  In fact, the Brown Settlement E-mails also support the Court's finding that the Debtor believed that resolution of the Security Mutual Case would occur in December 2011 or January 2012.

_____

[10]At Trial, the Debtor testified that this statement was incorrect, but could not identify when he came to discover the erroneous nature of the statement and whether he advised Mr. Pozzuoli that the statement was incorrect.

## 2.    The McLaughlin Prepetition E-mails

Concomitantly with the Pozzuoli Prepetition E-mails, the Debtor engaged in e-mail communications with Mr. McLaughlin, the Chief Financial Officer of Tripp Scott and a co-originator of the Home Depot Case, regarding the proper allocation of the $10 Million Fee among the firm's Directors in December 2011 (the "McLaughlin Prepetition E-mails"). The McLaughlin Prepetition E-mails were admitted into evidence at Ex. 7. The McLaughlin Prepetition E-mails buttress the Court's finding and reflect the Debtor's belief, as well as the belief of Tripp Scott's CFO, that the compensation system at Tripp Scott vested the Debtor with a multi-million dollar, prepetition interest in the $10 Million Fee and that the Compensation Committee did not have the discretion to deny the Debtor a performance bonus pursuant to the firm's compensation system. Like the Pozzuoli Prepetition E-mails, the McLaughlin Prepetition E-mails show that the Debtor believed that he possessed an interest in the $10 Million Fee prior to the Petition Date, and that members of the firm (including its President and CFO) were engaged in prepetition discussions regarding the distribution of such proceeds among the Firm's Directors.

Among other discussions contained in the McLaughlin Prepetition E-mails, for example, the following is noted:

- On December 22, 2011, at 11:21 a.m., Mr. McLaughlin advised the Debtor: "Don't fall into the trap about using the same methodology used for the normal bonus pool. The budgeted profit of the firm is around 15%. A $3M total partner would generate 450,000 in profit for the firm in one year. Meaning it would take them 10 years to generate the profit generated by Powell [Home Depot] alone." Ex. 7, PGH (2) – 00675.

- Later on that same date at 12:04 p.m., Mr. McLaughlin further discusses the extent of discussions regarding the allocation of the $10 Million Fee among the Directors, noting "I am not far off your 33%. I am a lot closer to you than Ed's $2,000,000 based upon his

16

formulas.  Split the different between 25% and 33% and you are there.  He has you at 20%." Ex. 7, PGH (2) – 00673.

- In response to Mr. McLaughlin's email, at 12:20 p.m., the Debtor stressed as follows: "Not sure who told you I was att [sic] 33 percent. I'm far north of that based upon even the firms [sic] own methodology." *Id.*

Taken together, these communications, coupled with the Pozzuoli Prepetition E-mails, demonstrate not only that the Debtor believed he was entitled to a significant bonus from the $10 Million Fee prior to the Petition Date, but, perhaps more importantly, that the firm's other Directors, including its CFO and two members of the Compensation Committee (Mr. Pozzuoli and Mr. Smith) were actively engaged in establishing the final amount of such compensation prior to the Petition Date.  None of the foregoing communications contain any suggestion that the Debtor was not entitled to a performance-based bonus from the $10 Million Fee on account of the Contingency Fee Cases or could be denied any such bonus at the sole discretion of the Compensation Committee.

Based on the foregoing communications, the Court finds that the Debtor's, Mr. Brown's and Mr. Pozzuoli's testimony at the Trial that the Compensation Committee had sole discretion to award bonuses does not mean that the Compensation Committee could have denied the Debtor a bonus from the $10 Million Fee. At most, the testimony and evidence at Trial shows that the Compensation Committee had the authority to determine the exact amount of the Debtor's bonus from the $10 Million Fee within a range of reasonableness based upon the factors ordinarily considered and applied by the Committee in making such determinations.

17

### E.        Resolution of the Contingency Fee Cases

As discussed above, Tripp Scott received fees of $4,126,016.00 on March 1, 2012, based upon the Home Depot Judgment and $5,796,000.00 on March 13, 2012, based upon the Security Mutual Judgment.  These two fee payments were made based upon months of prepetition settlement negotiations.  The settlement communications between Mr. Brown and defendants' respective counsel in the Contingency Fee Cases in the months and days leading up to the Petition Date, which were admitted into evidence at Ex. 27 (the "Brown Settlement E-mails"), demonstrate that not only did the Debtor reasonably believe that resolution of those cases was imminent on the Petition Date, but he actually knew substantive resolution had occurred prior to the Petition Date.  As discussed below, the evidence at Trial establishes that the Contingency Fee Cases were virtually resolved prior to the Petition Date, and resolved with finality, both substantively and formally, within days after the Petition Date.  The Court discusses the Brown Settlement E-mails below.

At Trial, the Debtor and Mr. Brown testified concerning Rule 50 motions[11] in the Security Mutual Case and issues regarding a fee dispute with the law firm of Mayback & Hoffman ("Mayback") in the Home Depot Case.  Mr. Brown also testified at Trial that Home Depot intended to challenge the Federal Circuit's affirmance of the Home Depot Final Judgment in the Supreme Court of the United States.  These issues raised by the Debtor's in support of the proposition that Tripp Scott's receipt of the $10 Million Fee on the Petition Date was uncertain.  The Court addresses these points below.

---

[11]The Court infers that the Debtor and Mr. Brown were referring to motions brought by the defendant in the Security Mutual Case pursuant to Federal Rule of Civil Procedure 50, in which the defendant sought to avoid the effect of the Security Mutual Final Judgment.  *See* Fed. R. Civ. P. 50.

### 1.    Resolution of the Security Mutual Case

The Brown Settlement E-mails show that the Security Mutual Case was effectively substantively resolved prior to the Petition Date, and fully resolved, both substantively and formally, by an executed settlement agreement nine days after the Petition Date. Moreover, the Court finds that the Rule 50 motions referenced by the Debtor and Mr. Brown do not support a finding that a successful resolution of the Security Mutual Case was doubtful on the Petition Date.

### a.    Brown Settlement E-mails Relating to the Security Mutual Case

On December 1, 2011, counsel for Security Mutual advised Mr. Brown, "We have just circulated amongst our side the latest revisions to the agreement. We anticipate getting it to you and Pete tomorrow. Just wanted you to know where we were with the draft." Ex. 27, Brown-0007. Then on December 2, 2011, the defendant's post-trial counsel at Sullivan & Cromwell, LLP, wrote Mr. Brown, "Alex, here is the draft settlement agreement. We look forward to receiving your comments. For planning purposes, Security Mutual needs to have the final form of the agreement authorized and approved at the next board meeting, which will be held on December 15, 2011." Ex. 7, Brown-0008. A draft settlement agreement was attached to this e-mail. *See id.* Thus, the Debtor and Mr. Brown had a draft settlement agreement from Security Mutual on December 2, 2011, and they knew on December 2, 2011, that Security Mutual sought to have the settlement agreement finalized as early December 15, 2011. Notwithstanding the foregoing, revisions to the draft settlement agreement continued through February 27, 2012, when the agreement was signed by the parties, nine days after the Debtor filed bankruptcy.

While Mr. Brown testified at Trial that there were "deal breaker" terms that in his view made consummation of the settlement in the Security Mutual Case uncertain, there is no documentary

evidence, including in any of the Brown Settlement E-mails, that supports this position.  To the contrary, although the settlement agreement and related revisions were not presented into evidence on the grounds of confidentiality, the Brown Settlement E-mails relating to the Security Mutual Case do not show a breakdown in negotiations or hint at a potential for the settlement to collapse at any point from December 2011 through execution of the settlement agreement in February 2012.  The Brown Settlement E-mails reveal that defendant's post-trial counsel at Sullivan & Cromwell, LLP consistently attempted to move the settlement negotiations along and expressed a desire on several occasions to finalize the matter in December 2011 and January 2012.

Given: (i) the size of the judgment; (ii) the nature of the settlement communications; (iii) the lack of any corroborative evidence; (iv) the Debtor's prior written representations to Mr. Pozzuoli that "I believe I have complete control over when we receive the settlement funds," *Id.* at PGH (2) – 000167; and (v) execution of the settlement agreement within days after the Debtor's bankruptcy filing, the Court finds Mr. Brown's vague and unsupported testimony concerning the alleged "deal breaker" provisions does not support a finding that the Debtor reasonably believed the settlement was in any way uncertain up through the time the settlement agreement was signed on February 27, 2012.  The evidence at Trial supports a finding to the contrary: the Debtor knew the settlement was anticipated and secure as of the Petition Date.

### b.    The Rule 50 motions

The Debtor and Mr. Brown testified at Trial that the defendants in the Security Mutual Case filed Rule 50 motions post-trial.  The Rule 50 motions were not introduced into evidence at Trial.[12]

---

[12]The Rule 50 motions filed by the defendants in the Security Mutual Case were tempered by the threat of an additional $12 million dollars in prejudgment interest sought by the plaintiffs in the Security Mutual Case.  Mr. Brown filed a motion on behalf of the plaintiffs seeking to add approximately $12 million of prejudgment interest to the $26 million judgment, which would have

The Debtor's testimony concerning the Rule 50 motions was very general.  It provided the Court with no detail as to the substance of the Rule 50 motions.  Mr. Brown's testimony concerning the Rule 50 motions had a bit more substance, but was still limited.  No corroborative documentary evidence was admitted by the Debtor to support the relative strength or weakness of the Rule 50 motions.

The Debtor attempted to use the testimony concerning the Rule 50 motions to support his position that on the Petition Date resolution of the Security Mutual Case was uncertain.  The documentary evidence admitted at Trial contradicts that position.  The nature of the communications from Security Mutual's counsel did not demonstrate that from December 2011 through February 2012 either of the post-trial motions filed in the Security Mutual Case were impeding the progress of the settlement negotiations.  While each party apparently attempted to posture through post-trial motions, the Court does not find that the Rule 50 motions, when juxtaposed with the documentary evidence, placed doubt in the Debtor's mind on the Petition Date concerning the likelihood of favorable resolution of the Security Mutual Case.

The Brown Settlement E-mails show an eager, not reluctant, settlement dialogue on the part of Security Mutual.  This documentary evidence leads to an inference that the defendants themselves were focused on settlement and not pursuing the Rule 50 motions.  The plaintiffs did not respond to the Rule 50 motions, which further demonstrates that they were not serious impediments to settlement.  The Rule 50 motions were never pending for hearing before the Court.  In fact, the docket in the Security Mutual Case, which was admitted into evidence as Ex. 25, contains a Minute Entry on January 26, 2012, stating, "Parties are working diligently to achieve settlement, however,

increased the judgment amount to approximately $38 million.  The prejudgment interest motion was admitted into evidence at Ex. 24.

21

one issue remains regarding the charging lien by Ronald Benjamin, Esq." Ex. 25, at 108. The Security Mutual Docket and the Brown Settlement E-mails show that the defendant in the Security Mutual Case, after prophylactically filing the Rule 50 motions, pivoted toward settlement and never turned back. Thus, the Debtor's and Mr. Brown's testimony concerning the Rule 50 motions provides little, if any, probative value relating to the Debtor's state of mind concerning the $10 Million Fee on the Petition Date.

### 2.    Resolution of the Home Depot Case

The Brown Settlement E-mails show that the Home Depot Case was effectively substantively resolved prior to the Petition Date and fully resolved days later by Tripp Scott's receipt of its fee on March 1, 2012. Moreover, the Court finds that the fee dispute with Mayback and Home Depot's intention to seek certiorari (as referenced by the Debtor and Mr. Brown in their Trial testimony) do not support a finding that resolution of the Home Depot Case was doubtful on the Petition Date.

### a.    Brown Settlement E-mails in the Home Depot Case

On November 14, 2011, the Federal Circuit affirmed the Home Depot Judgment. On February 15, 2012, Tripp Scott's co-counsel for appellate purposes in the Home Depot Case sent Home Depot's appellate counsel an e-mail containing the amount of the outstanding Home Depot Judgment along with a post-judgment interest *per diem* figure. Ex. 27, Brown-0160. The very next day, on February 16, 2012, the Federal Circuit issued its mandate concerning its affirmance of the Home Depot Judgment. Also on February 16, 2012, Mr. Brown sent Home Depot's appellate counsel a W-9 to facilitate satisfaction of the Home Depot Judgment. *Id.* at Brown-0166. The e-mail communications between Mr. Brown and Home Depot's appellate counsel after February 16, 2012, only address the manner in which the amount of the judgment would be paid, either by check

or wire transfer.  Thus, the Court finds that as of February 16, 2012, the Debtor was aware that Home Depot had agreed to satisfy the Home Depot Judgment.

The Court finds that the e-mail conveying the amount of the Home Depot Judgment along with a *per diem* figure for post-judgment interest shows that Home Depot had laid down its proverbial arms (to use Mr. Brown's words from his Trial testimony) on that day.  In a case which the Debtor and Mr. Brown described as the most heavily litigated case they had ever seen, one of the parties does not send the other party an e-mail with the amount of the judgment and a post-judgment interest *per diem* if their minds have not met concerning resolution.  The Brown Settlement E-mails contain no statement or indication after February 16, 2012, that Home Depot was not going to satisfy the Home Depot Judgment, nor do they contain statements by Mr. Brown that his client had not agreed to satisfaction of the Home Depot Judgment as an acceptable resolution of the case.  Based upon the documentary evidence admitted  and the testimony given  at Trial, the Court finds the Home Depot Case was substantively resolved prior to the Petition Date.  Thus, the Court finds that on the Petition Date the Debtor knew Home Depot was going to satisfy the Home Depot Judgment.

### b. Home Depot's Alleged Intention to Seek Certiorari in the Supreme Court

While Mr. Brown testified that Home Depot planned on seeking certiorari and pursuing the matter to the Supreme Court of the United States, there was no documentary evidence admitted at Trial supporting this notion.  Further, his testimony concerning this issue was vague and very general.  The Debtor did not testify concerning this subject.

When questioned on cross-examination, Mr. Brown testified that Home Depot did not file a motion to stay the issuance of the Federal Circuit's mandate.  He was unfamiliar with the

23

procedure by which Home Depot could have sought certiorari. He also testified that Home Depot did not file a petition for certiorari. Testimony concerning a litigant's posturing about seeking certiorari is much different than testimony relating to the exact rules, deadlines and procedures and how such hurdles would be met. Mr. Brown's testimony merely constituted posturing, and therefore is of little value, if any. Based upon the lack of documentary evidence and the lack of specificity in Mr. Brown's testimony, the Court finds that testimony concerning Home Depot's desire to seek certiorari deserves little weight. Thus, Mr. Brown's testimony is not probative evidence regarding the Debtor's state of mind concerning the likelihood of resolution of the Home Depot Case on the Petition Date.

### c.      The Mayback Fee Dispute

All three witnesses at Trial testified about Tripp Scott's fee dispute with Mayback in the Home Depot Case. Mr. Pozzuoli had very little personal knowledge concerning the Mayback issues and obtained most, if not all, of it from the Debtor or Mr. Brown. Both the Debtor's and Mr. Brown's testimony concerning the Mayback fee dispute was general and lacked specific details. Rather, they testified about what Mayback threatened to do without supporting their testimony with any documents filed by Mayback or rulings from either District Judge Hurley or Magistrate Judge Hopkins. No document was introduced into evidence relating to the Mayback fee dispute.

There was no evidence presented at Trial that supported the notion that Mayback had any chance to prevail in denying Tripp Scott the fee it was entitled to under its contingency fee contract with its client. There was no evidence admitted at Trial that Tripp Scott's client had any issue with paying Tripp Scott the contractually agreed upon contingency fee upon payment by Home Depot. In fact, Mr. Brown testified that the client in the Home Depot Case terminated Mayback, which

supports a finding that Mayback's position was untenable.  No documentary evidence or Trial testimony showed that District Judge Hurley or Magistrate Judge Hopkins gave any credence to Mayback's efforts.  Further, no Trial testimony or documentary evidence supported the position that anything more than the $1.8 million from the satisfaction of the Home Depot Judgment, placed in escrow with the Court, was reachable by Mayback.  The $1.8 million was in excess of the $4,126,016.00 Tripp Scott received on March 1, 2012.

Ultimately, Mayback's attempt to disqualify Tripp Scott was denied.  Tripp Scott received an additional approximately $272,000.00 from the $1.8 million put in escrow to resolve the Mayback fee dispute, consistent with the Debtor's e-mail of January 9, 2012, to Mr. Pozzuoli, in which he noted that, "[Mayback's] arrangement does not affect our fee and, in fact, *the only thing that will potentially happen will be that we will be receiving more money*."  Ex. 2, PGH(2) – 000167 (emphasis added).

The Court finds that based upon the testimony given and evidence submitted at Trial, any belief by the Debtor on the Petition Date that Tripp Scott was likely to lose the fee to which it was entitled in the Home Depot Case based upon the actions of Mayback was unreasonable and not credible.  The docket in the Home Depot Case was introduced into evidence at Ex. 28, and a review concerning the Mayback issues supports the Court's finding.

### F.    The Debtor's Knowledge and State of Mind on the Petition Date

On the Petition Date, the evidence at Trial demonstrates that the Debtor knew the following facts: (i) the terms of the contingency fee contracts with the plaintiffs in the Contingency Fee Cases; (ii) the amount of the judgments in each of the Contingency Fee Cases; (iii) the gross amount of the fees due to Tripp Scott was approximately $10 million; (iv) Home Depot was a public company; (v)

the settlement agreement in the Security Mutual Case was on the verge of being finalized; (vi) Home Depot had agreed to and was about to pay the Home Depot Final Judgment; (vii) CIB Marine held the CIB Marine Judgment against him; (viii) CIB Marine had sought to garnish his wages and bank accounts based upon the CIB Marine Judgment; (ix) he had waived all exemptions other than homestead in the Debtor Guaranty; (x) he was co-lead trial counsel on the Contingency Fee Cases and, thus, generated substantial work revenue credit from those cases; (xi) he was co-originator of the Contingency Fee Cases, which meant he was to receive substantial client generation credit; (xii) for the last four years while working on the Contingency Fee Cases he had received a bonus far less than the top performing Directors in terms of client generation and work revenue; (xiii) the lowest bonus amount Directors at Tripp Scott were discussing he was going to receive from the $10 Million Fee was $2 million; (xiv) Tripp Scott is a subchapter C corporation and needed to disburse the $10 Million Fee prior to the end of 2012 to avoid tax consequences at the corporate level; (xv) Tripp Scott had consistently paid him a performance bonus pursuant to the firm's compensation system for Directors for at least the preceding twelve years, but possibly longer; (xvi) the judgments in the Home Depot and Security Mutual Cases were the largest judgments the Debtor ever obtained on behalf of a single client during his entire career as an attorney, and the fees they generated represented the largest lump sum fees the firm had ever earned; and (xvii) in the last ten years, or possibly longer, excluding financial reasons, Tripp Scott had not failed to award a Director a bonus if the Director was alive and employed at the time the bonus was awarded.

Based upon the foregoing facts, and the additional facts set forth above, the Court finds that, on the Petition Date, the Debtor reasonably believed he had an interest in and would receive a multi-million bonus from the $10 Million Fee. In addition, on the Petition Date, the Debtor reasonably

anticipated that his income would increase by millions of dollars within the year after filing his bankruptcy Schedules.  The Pozzuoli Prepetition E-mails and the McLaughlin Prepetition E-mails demonstrate that the Debtor believed he had an interest in the $10 Million Fee worth millions of dollars prior to the Petition Date.  The Brown Settlement E-mails show that on the Petition Date, the Debtor knew Tripp Scott would receive the $10 Million Fee shortly after the Petition Date.  Finally, as discussed below in section I.H, *infra*, the very fact that the Debtor conducted legal research concerning whether he had a sufficient interest in the $10 Million Fee so as to require disclosure demonstrates by itself that he reasonably expected receiving a portion of the $10 Million Fee on the Petition Date.  If he did not expect to receive a bonus from the $10 Million Fee there would have been no need to perform legal research to determine whether the interest could be omitted from his bankruptcy Schedules and SOFA.  Therefore, the Debtor's testimony that on the Petition Date he did not reasonably anticipate Tripp Scott would receive the $10 Million Fee is not credible.  Likewise, the Debtor's testimony at Trial that he did not believe he possessed an interest in the $10 Million Fee on the Petition Date is unbelievable.

### G.    The Debtor's Schedules and SOFA

On March 20, 2012, the Debtor filed his Bankruptcy Schedules ("Schedules") and Statement of Financial Affairs ("SOFA").[13]  By March 20, 2012, Tripp Scott had received the entire $10 Million Fee, having received the Home Depot fee on March 1, 2012, and the Security Mutual fee on March 13, 2012.  The Debtor testified at Trial that the Schedules and SOFA that appear at Ex. 12 are the Schedules and SOFA that he authorized and approved for filing.

---

[13]The Debtor requested and received two extensions of time to file his Schedules and SOFA.

The Debtor's Schedules required the Debtor to make the following declaration: "I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of 17 sheets, and that they are true and correct to the best of my knowledge, information and belief." Ex. 12 at 18. The Debtor testified that he signed the declaration concerning the Schedules and understood what the declaration meant when he signed it. Further, the Debtor's SOFA requested the Debtor to make the following declaration: "I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct." Ex. 12 at 27. The Debtor testified that he signed the declaration concerning the SOFA and understood what it meant when he signed it.

As discussed below, the Court finds that the Debtor's Schedules and SOFA do not contain accurate information because the Debtor failed to disclose his interest in the $10 Million Fee and omitted material information relating to prepetition transfers to his ex-wife.

### 1.    Schedule B Issues

The Debtor did not list a "bonus" as an asset on Schedule B in his Bankruptcy Schedules. Question No. 21, Schedule B, required the Debtor to disclose "[o]ther contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims." As stipulated to in the Pretrial Stipulation, the Debtor disclosed a potential litigation claim against the law firm Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. ("Stearns Weaver") and against CIB Marine for wrongful foreclosure and abuse of process. For No. 21, Schedule B, the Debtor did not list any other contingent assets besides litigation claims against CIB Marine and Stearns Weaver. The Debtor admitted at Trial that No. 21, Schedule B, does not make reference to the $10 Million Fee.

28

The Debtor testified at Trial that he was aware of the meaning of a contingent claim in the context of representing plaintiffs in contingency fee cases. The Court finds that based on the level and sophistication of the Debtor's legal experience, he thoroughly understands the nature of contingent claims. The Court further finds that the Debtor is a highly sophisticated debtor, especially for a Chapter 7 debtor, based upon, *inter alia*: (i) his annual income, which has been over the last three years in excess of $250,000.00; (ii) his experience as a trial lawyer; (iii) his being a former member of the Tripp Scott Compensation Committee; (iv) his position as head of Tripp Scott's litigation department; and (v) his involvement in a multi-million dollar real estate investment. The Court finds that, given the level of the Debtor's sophistication, the Debtor knows exactly what a contingent claim is within the meaning of No. 21, Schedule B. The Debtor knew that he had an interest in the $10 Million Fee on the Petition Date, and he knew that interest constituted a contingent interest within the meaning of No. 21, Schedule B. Nevertheless, the Debtor failed to disclose his interest in the $10 Million Fee on Schedule B. The Court finds this non-disclosure was knowing, intentional, and not a mistake. In fact, on cross-examination by the Plaintiffs' counsel, the Debtor testified that he made an intentional decision to exclude it from his Schedules and SOFA, and "[i]t wasn't a mistake." Trial Tr. 114:15-24.

This finding is further buttressed by the Debtor's listing of "litigation claims" against CIB and its counsel, Stearns Weaver, for wrongful foreclosure and abuse of process. The Debtor testified that, as of the date of the Trial, he had not filed a lawsuit against CIB Marine or Stearns Weaver. The Debtor admitted in the Pretrial Stipulation that the litigation claims against CIB Marine and Stearns Weaver were *potential* only. This shows the Debtor was fully aware of the type of claims he was required to disclose in response to No. 21, Schedule B. Unlike the scheduled potential

litigation claims against Stearns Weaver and CIB Marine, which had and have to date not been filed, the evidence at Trial shows the Debtor's interest in the $10 Million Fee was fully vested on the Petition Date because of the terms of the contingency fee contracts, the final judgments, the status of the settlement negotiations, the Pozzuoli Prepetition E-mails, the McLaughlin Prepetition E-mails, and Tripp Scott's compensation system.  On the Petition Date, the Debtor was required to take no further actions except receive his multi-million dollar bonus from the $10 Million Fee.  Scheduling the claims against Stearns Weaver and CIB Marine in response to No. 21, Schedule B shows the Debtor knew exactly what a contingent claim was on the Petition Date, but chose to intentionally omit his interest in the $10 Million Fee.

The Debtor testified that he did not consider the anticipated bonus, in an unknown amount, from the $10 Million Fee on Schedule C and claiming it as exempt.[14]  Of course, had he disclosed his interest in the $10 Million Fee on Schedule B, CIB Marine, other creditors and Trustee Welt would have been alerted to the fact that a multi-million dollar asset was potentially available to the estate if the claimed exemption could be defeated.  The Court finds that the waiver of exemptions (other than as to homestead) that is set forth in the Debtor Guaranty provides a material motivation for the Debtor to have not listed his interest in the $10 Million Fee on Schedule B and claim it as exempt on Schedule C, as the record reflects he did with respect to this 2011 bonus.  The 2011 bonus

---

[14]Relevant to and supportive of the finding that the Debtor intentionally omitted his interest in the $10 Million Fee on Schedule B is the fact that the Debtor listed on Schedule B a bank account at Paradise Bank with funds on deposit in the amount of $39,000.00.  Ex. 12 at 4.  The Debtor testified that the funds in this account were derived from his 2011 bonus from Tripp Scott.  The Debtor claimed the $39,000.00 on deposit in the Paradise Bank account as exempt on Schedule C pursuant to section 222.11 of the Florida Statutes.  Ex. 12 at 9.  The fact that the Debtor scheduled his 2011 bonus on Schedule B and claimed it as exempt on Schedule C establishes that the Debtor knew that if he had in fact disclosed his interest in the $10 Million Fee on Schedule B or I or both, he could have claimed that interest as exempt on Schedule C.

was paid in 2011; and thus, already in the Debtor's bank account; so it was readily discoverable and traceable, making disclosure of that money unavoidable.  However, the Debtor had not received his multi-million dollar bonus from the $10 Million Fee on the Petition Date so discovery and tracing was not an issue.

Finally, the Debtor did not list his interest in the $10 Million Fee in any other place on Schedule B, including in response to No. 19, "Equitable or future interests . . . ." or No. 35, "Other personal property of any kind not already listed . . . ."  Ex. 12 at 6, 8.

### 2.    Schedule I Issues

Question No. 17, Schedule I, required the Debtor to "[d]escribe any increase or decrease in income reasonably anticipated to occur within the year following the filing of this document."  Ex. 12 at 16.  The Debtor answered No. 17, Schedule I, as follows: "Annual performance bonus (historically 65,000 – 70,000)."  *Id.*  The Debtor admitted at Trial that No. 17, Schedule I does not make reference to the anticipated increase in income from the $10 Million Fee. Again, the information provided and omitted  by the Debtor on Schedule I was intentional and not the result of a mistake.

Indeed, by referring to his "annual performance bonus" in the historical amount of $65,000 to $70,000 as the only prospective income change he anticipated receiving in the next year, the Debtor's disclosure was materially misleading.  He had, as of the Petition Date, sought (and ultimately received)  a special bonus in the millions of dollars.  The evidence is clear that Tripp Scott had never issued a mid-year special bonus to its Directors, and had never received a lump sum fee collection remotely as high as the $10 Million Fee.  The Debtor demanded, expected, knew he would receive and did receive a huge bonus in mid-year 2012.  His failure to disclose anything with

respect to this assured bonus renders his Schedules and SOFA materially misleading and willfully false.

The Tripp Scott compensation system vested the Debtor with a prepetition interest in the $10 Million Fee. The Pozzuoli Prepetition E-mails, the McLaughlin Prepetition E-mails, judgments in the Contingency Fee Cases, and the Brown Settlement E-mails, show the Debtor knew that he was going to receive a multi-million dollar bonus in 2012 in addition to his annual performance bonus. In short, on the Petition Date, the Debtor reasonably anticipated receiving a multi-million dollar bonus from the $10 Million Fee and did not disclose this reasonable belief on Schedule I.

Contrary to the Debtor's testimony, which the Court finds incredible, the Court finds that based upon the evidence presented at Trial, the disclosures made by the Debtor in response to No. 17, Schedule I, did not disclose his interest in the $10 Million Fee. Based upon the testimony and documentary evidence at Trial, the words "Annual performance bonus (historically 65,000-70,000)" did not disclose the Debtor's interest in a bonus from the $10 Million Fee. Ex. 12 at 16.

Finally, the Court questions how, if both the historical bonus and bonus from the Contingency Fee Cases were dependent on the firm's consideration of the same factors, one could be subject to disclosure on the Debtor's Schedules and the other not.

### 3.  SOFA Issues

The Debtor failed to adequately explain the reason there was an inconsistency with the disclosure of compensation paid to his counsel, Bart A. Houston, Esq., through his prior firm Kopelowitz Ostrow, on his SOFA and the Disclosure of Attorney Compensation filed on March 20, 2012 (as part of the Bankruptcy Rule 2016 Statement) (Bankr. Case ECF No. 17).  Moreover, as discussed below, the Debtor failed to disclose transfers of money to his ex-wife within the year prior

to the Petition Date in his SOFA. These inconsistencies represent additional issues that challenge the veracity of the Debtor's Schedules and SOFA. They demonstrate the Debtor's blatant disregard for his disclosure obligations, which are a condition precedent to his receipt of a discharge under Title 11 U.S.C. § 727.

### H.    The Debtor's Legal Research Concerning the $10 Million Fee

The Debtor testified at trial that he did independent legal research and also analyzed cases provided to him by his counsel concerning the issue of whether his interest in the $10 Million Fee constituted property of the estate in connection with preparing his Schedules and SOFA.[15] The Debtor testified that based upon his legal research he believed that any bonus he received from the $10 Million Fee would not be property of the estate.

This testimony puts the Debtor's entire trial presentation into context. Many of the terms used in the case law cited by the Debtor in his Trial Brief (ECF No. 92) were used in the testimony by the Debtor himself, Mr. Pozzuoli and Mr. Brown. However, these terms did not appear in the Pozzuoli Prepetition E-mails or the McLaughlin Prepetition E-mails, which were written at a time when the Debtor had not conducted the legal research he relied upon when he decided to not disclose his interest in the $10 Million Fee in his Schedules and SOFA because he determined it was not property of the estate. The Court draws an inference that the Debtor's testimony at Trial was shaped by his view of the law that he believed supported his position that he did not have to disclose his interest in the $10 Million Fee. The stark contrast between the Pozzuoli Prepetition E-mails and the McLaughlin Prepetition E-mails underscores the untenability of the suggestion that the Compensation Committee maintains the sole and unfettered discretion to award bonuses and,

---

[15]This research occurred prior to March 20, 2012, the date on which the Schedules and SOFA were filed.

therefore, the Debtor did not have a reasonable belief that he had an interest in the $10 Million Fee on the Petition Date.  The Court finds that the Debtor's testimony concerning his legal research relating to the Debtor's interest in the $10 Million Fee and property of the estate proves that the Debtor reasonably believed he had an interest in the $10 Million Fee on the Petition Date.  If the Debtor had no belief that he had an interest in the $10 Million Fee, there would be no need to conduct legal research.  The Debtor was required to disclose this interest in his Schedules.

## I.       The Pam Herman Transfers

Prior to the Petition Date, the Debtor had an investment account at American Funds (Account No. XXXX4161), through which he held shares in The Growth Fund of America-A and The Growth Fund of America-B (collectively, the "Growth Fund Shares").  The Growth Fund Shares were assets of the Debtor that were purchased with the Debtor's savings.  *See* Pretrial Stipulation at ¶ 51.

On or about November 29, 2011, the Debtor caused his Growth Fund Shares, which constituted property of the Debtor, to be liquidated for an aggregate sale price of $46,278.25 (the "Sale Proceeds").  The Debtor received payment on the Sale Proceeds via two separate checks from American Funds in the amounts of $24,545.45 and $21,732.80 (the "American Funds Checks"), both of which were payable to the Order of "Peter G. Herman."  *Id.* at ¶¶ 52-53.

On or about December 7, 2011, the Debtor caused the American Funds Checks to be deposited in an account at Wells Fargo Bank (Account No. XXXX9849), which was a joint account in the name of the Debtor, Peter G. Herman, and his ex-wife, Pamela M. Herman (the "Joint Account").  *Id.* at ¶ 54.  The Debtor listed his interest in the Joint Account on Schedule B of his Schedules.  On the very next day, December 8, 2011, the Sale Proceeds in the Joint Account were transferred to a separate account held solely by Pamela M. Herman at Wells Fargo Bank (Account

34

No. XXXX0370) (the "<u>First Pam Herman Account</u>").  At the time immediately preceding the foregoing transfer, the First Pam Herman Account held only $30.11.  The Debtor does not have any ownership interest in First Pam Herman Account, did not list any ownership interest in such account as an asset in his Schedules, and did not list the transfer of the Sale Proceeds to the First Pam Herman Account in his SOFA.  *Id.* at ¶ 55.  On or about December 9, 2011, the Sale Proceeds were transferred from the First Pam Herman Account to a separate account held solely by Pamela M. Herman at Wells Fargo Bank (Account No. XXXX9086) (the "<u>Second Pam Herman Account</u>"). From the time of the foregoing transfer, and through the Petition Date, the Second Pam Herman Account was funded exclusively by the transfer of the Sale Proceeds and interest accruing thereon and did not contain any other funds.  The Debtor does not have any ownership interest in the Second Pam Herman Account, did not list any ownership interest in such account as an asset in his Schedules, and did not list the transfer of the Sale Proceeds from the First Pam Herman Account to the Second Pam Herman Account in his SOFA.  *Id.* at ¶ 56.

As of the Petition Date, the Second Pam Herman Account contained only $90.07.  In the 37 days preceding the Debtor's bankruptcy filing, the remainder of the Sale Proceeds were transferred out of the Second Pam Herman Account as follows (collectively, the "<u>Transfers</u>"):

  i. $5,000 (Withdrawal) on January 13, 2012;

  ii. $1,500 (Withdrawal) on February 3, 2012;

  iii. $30 (Wire Transfer) on February 10, 2012;

  iv. $35,000 (Wire Transfer to The Kopelowitz Firm PA[16] Trust Account) on February 10, 2012;

  v. $400 (Online Transfer to First Pam Herman Account) on

---

[16]The Debtor's bankruptcy lawyer was employed at this law firm at the time of the transfer.

February 14, 2012; and

vi.    $4,300 (Withdrawal) on February 17, 2012.

As stipulated to in the Pretrial Stipulation, the Debtor did not list any of the foregoing Transfers on his Schedules or SOFA. *Id.* at ¶¶ 58-59.

The testimony at Trial and the documentary evidence introduced showed that when the Transfers were made, CIB Marine had obtained the final judgment of foreclosure against Esquire Ventures, and the Debtor admitted that CIB Marine had filed the motion seeking a deficiency judgment against him. The Transfers were from the Debtor to Pam Herman's account in which the Debtor admitted he did not have an interest. The CIB Marine Judgment was not against Pam Herman. Thus, the Court finds that the Transfers effectuated a movement of funds from an account subject to CIB Marine's reach to an account out of CIB Marine's reach.

The Debtor's testimony about the Transfers was not credible. The Debtor was unable to explain the discrepancy between the $35,000 transfer Pam Herman made to The Kopelowitz Firm PA Trust Account and his disclosure of a $15,000 transfer to Kopelowitz in his SOFA. The Debtor could not identify where the additional $20,000 to the Kopelowitz Firm was disclosed in his Schedules or SOFA, and ultimately admitted that the $20,000 transfer was not disclosed. The Court further finds that the Debtor's testimony that certain transfers were made to pay workmen on his condominium was not credible, as no documents were admitted into evidence to support this contention, the Debtor did not identify who was paid, and these transfers were not disclosed in his Schedules or SOFA. The Debtor admitted at Trial that the Transfers in the amount of approximately $46,000 were not disclosed in his Schedules or SOFA.

**J.    The Debtor's Intent to Hinder, Delay or Defraud his Creditors and Trustee Welt**

36

The Court finds that the Debtor omitted his interest in the $10 Million Fee and the Transfers from his Schedules (including Schedules B and I) and SOFA with the intent to hinder, delay or defraud his creditors.  The Debtor purposefully did not disclose his interest in the $10 Million Fee with fraudulent intent in an attempt to prevent his creditors, primarily CIB Marine and Trustee Welt, from discovering such interest so that he could keep his multi-million dollar bonus for himself and pay none of it to his bankruptcy estate or his creditors.  The Court finds the Debtor's failure to disclose his interest in the $10 Million Fee in his Schedules and SOFA was intentional and based upon a motive to conceal his prepetition interest in the $10 Million Fee, to obtain all of the money in his prospective bonus for himself, and to pay none of it to his creditors, all at a time when CIB Marine was executing on its multi-million judgment.

The evidence shows that the Debtor has been the subject of the CIB Marine Judgment in the approximate amount of $4.5 million since December 8, 2011.  The Debtor knew the amount of the deficiency since at least mid-November 2011.  The hearing on CIB Marine's deficiency judgment occurred on the same day (December 6, 2011) the Debtor commenced a protracted e-mail campaign with the President of Tripp Scott concerning allocation of the $10 Million Fee.  The Debtor testified that when he filed bankruptcy, CIB Marine was the only creditor that had a judgment against him. The Debtor also testified that CIB Marine was the only creditor garnishing his wages at Tripp Scott and his bank accounts.  The Debtor knew that he waived, in the Debtor Guaranty, any exemption claim that he could have attempted to use to protect his interest in a bonus from the $10 Million Fee. Thus, disclosure of the interest in the $10 Million Fee and seeking to claim it as exempt would jeopardize retention of the multi-million bonus he expected to receive from his interest in the $10 Million Fee.

The evidence demonstrates that both the judgments and the fees in the Contingency Fee Cases were the largest the Debtor had ever received in his thirty-plus-year career as an attorney. The Debtor testified that in 2011 and 2012 he knew the gross amount of the fees Tripp Scott was entitled to receive under the contingency fee contracts in the Contingency Fee Cases was approximately $10 Million. The Pozzuoli Prepetition E-mails and the McLaughlin Prepetition E-mails show that the Debtor was contemplating how much of the $10 Million Fee he was going to receive for months, if not longer, prior to the Petition Date. The Brown Prepetition E-mails show that on the Petition Date the Debtor knew Tripp Scott was going to receive the $10 Million Fee within weeks, if not days, after the Petition Date. In fact, Tripp Scott received all of the $10 Million Fee only weeks after the Petition Date and prior to the date on which the Debtor filed his Schedules and SOFA. The Debtor controlled when he filed his bankruptcy petition and the chapter of the Code under which he filed. He did not consider filing a Chapter 11 case in which he could have paid his creditors over time using the bonus generated from the $10 Million Fee.

According to the evidence from the Tripp Scott documents introduced at trial, $2 million was the lowest amount which the firm contemplated paying the Debtor of the $10 Million Fee. Tripp Scott actually paid him $2.7 million. The Debtor testified that prior to the $2.7 million bonus award for the fees generated by the Contingency Fee Cases, he was never awarded a single bonus in excess of one million dollars during his employment at Tripp Scott. Mr. Pozzuoli testified that the $2.7 million bonus award was by far the largest in relation to other Directors and was the largest bonus Tripp Scott had ever given out to any Director in his fifteen years with the firm.

The Court finds based upon the demeanor of the Debtor at Trial, the documentary evidence presented at Trial, and the testimony of Mr. Brown and Mr. Pozzuoli, the Debtor filed his Chapter

7 bankruptcy case and concealed his inchoate interest in the $10 Million Fee and the Transfers with the actual intent to hinder, delay or defraud his creditors, principally CIB Marine, and Trustee Welt. The Chapter 7 bankruptcy case was the vehicle through which he sought to discharge the CIB Marine Judgment.  The concealment of his interest in the $10 Million Fee from his Schedules and SOFA would (he hoped and anticipated) allow him to keep millions of dollars and be free from the CIB Judgment.  The Debtor's testimony that he conducted legal research concerning whether his interest in the $10 Million Fee was property of the estate shows that he was seeking to conceal his interest which he knew was a prepetition contingent asset. The Debtor's statement that he believed he did not provide false information in his Schedules and SOFA is not credible. The Court finds that the Debtor's testimony that he believed he fairly disclosed his assets and liabilities is not believable. The Court finds, based upon the evidence, that the Debtor filed bankruptcy to discharge his prepetition debt, including the CIB Marine Judgment, and keep all of his interest in the $10 Million Fee.  Finally, the Court finds that the Transfers were made to place the transferred funds out of the reach of the Debtor's creditors, which was accomplished by transferring the money to an account in which he held no legal interest.

### K.    The Debtor's $2.7 Million Bonus from the $10 Million Fee

Tripp Scott received the entire $10 Million Fee by March 13, 2012.  Mr. Pozzuoli testified that in August 2012 the Compensation Committee met to award bonuses to Directors from the $9.6 million bonus pool derived from the $10 Million Fee.[17]  The August 2012 meeting was not the Compensation Committee's annual meeting, but rather was for the specific purpose of allocating bonuses to Directors from the $9.6 million bonus pool generated solely from the fees earned by

---

[17]$300,000 of the $10 Million Fee was allocated for non-directors at Tripp Scott.

39

Tripp Scott from the Contingency Fee Cases.

Prior to the Compensation Committee's meeting in August 2012, it circulated to Directors a document entitled "Director Bonus Allocation," which was admitted into evidence at Ex. 16, 17, and 22.[18]  The Director Bonus Allocation, which Mr. Pozzuoli testified was a performance analysis reflecting the "same criteria" used at year-end compensation meetings, advises Directors to consider "[t]otal production [meaning a combination of work revenue and client generations]" using the accompanying sheets, which reflected performance information for the prior 4 years, along with client generation and work revenue for all Directors involved in the Contingency Fee Cases.  As a result of its consideration of the responses of other Directors to the Director Bonus Allocation—which resulted in an average proposed distribution for the Debtor of approximately $2 million, *see* Ex. 16; Trial Tr. 210:16-19—and its consideration of the firm's performance metrics, the Compensation Committee ultimately awarded the Debtor a performance bonus of $2.7 million based upon his prepetition interest in the $10 Million Fee.

The Compensation Committee's allocation of $2.7 million from the $10 million Fee to the Debtor was not gratuitous.  Rather, the Debtor had earned that money over the years he spent working on the Contingency Fee Cases.  Tripp Scott's performance based system vested the Debtor with a right to a substantial portion of the $10 Million Fee when it was received by the firm.  The way Tripp Scott analyzes performance is by looking at aggregate client generation and work revenue.  This is common to the law firm business model where attorneys perform by generating clients and collecting dollars from the work they perform for clients.

---

[18]The Director Bonus Allocation documents contained in Exs. 16 and 17 are identical, but the document in Ex. 22 differs from the documents in Exs. 16 and 17.  Mr. Pozzuoli testified at Trial that he believed the documents in Exs. 16 and 17 were drafts and the document in Ex. 22 was actually circulated to the Directors.

The documents attached to the Director Bonus Allocation show that the Debtor's client generations and work revenue, including amounts from the Contingency Fee Cases, over the operative period of time aggregated to $11,810,171.70, which placed him as the number three Director when compared to the other Directors for purposes of aggregate client generations and work revenue. When the Debtor's bonuses are aggregated over the operative period of time, they total $354,000.00, which is less than one third of the amount paid to the other top three performing Directors in terms of total client generations and work revenue. The Court finds, based upon these figures, that the Debtor received substantially lower bonuses during the operative period of time, and thus was compensated less than other Directors because he was working on the Contingency Fee Cases, which generated no current revenue. When the fees from the Contingency Fee Cases were brought into Tripp Scott, he finally received credit for his labor over the years when he was working on the Contingency Fee Cases. The foregoing figures are as follows:[19]

| I.D. | Total Client Generations/Work Revenue | Total Bonuses 2008-2011 |
|------|----------------------------------------|--------------------------|
| 1 | $15,507,122.32 | $1,260,000 |
| 3 | $12,924,002.30 | $1,127,000 |
| PGH | $11,810,171.70 | $354,000 |
| 4 | $10,933,254.17 | $985,000 |

Ultimately, the Compensation Committee awarded the Debtor a $2.7 million bonus out of the $9.6 million bonus pool. The $2.7 million bonus was based upon the Debtor's aggregate client generations, work revenue and status as a Director. As the foregoing table reveals, the Debtor had earned the $2.7 million bonus by working on the Contingency Fee Cases for several years and

---

[19]The Court derived these figures from Ex. 22. Additionally, on Ex. 22, the identification of Directors that did not work on the Contingency Fee Cases were redacted and numerical identifiers were provided by counsel for Tripp Scott.

receiving a substantially lower bonus than other Directors.  Said differently, the $2.7 million bonus was paid to the Debtor after his vaulting up to the number three performing Director based upon his $11,810,171.70 in client generations and work revenue, status as a Director and his receipt of only $354,000.00 in bonuses during 2008 through 2011.

The evidence presented at Trial leads to the necessary conclusion that the Compensation Committee only had discretion to determine what amount, within a reasonable range, of the $10 Million Fee would be paid to the Debtor based upon his prepetition performance.  There was no testimony given or document introduced at Trial that suggests that the Compensation Committee would or could have exercised discretion and awarded the Debtor zero dollars from the $10 Million Fee.  Any other conclusion is so implausible as to be impossible to believe.  In fact, the Pozzuoli Prepetition E-mails and the McLaughlin Prepetition E-mails belie the notion that the Compensation Committee could have exercised its discretion and awarded the Debtor a "zero" bonus out of the $10 Million Fee.  Nowhere in any of the Pozzuoli Prepetition E-mails or the McLaughlin Prepetition E-mails is there even the remotest suggestion that the Debtor would get a bonus in the amount of zero dollars from the $10 Million Fee.  The evidence at Trial did not show that the Compensation Committee could have exercised discretion and determined that the Debtor was not entitled to any bonus from the $10 Million Fee only if he were dead or no longer employed by the firm.  There was no evidence introduced at Trial that showed the Debtor was in jeopardy of being terminated by Tripp Scott in either 2011 or 2012, nor was there any evidence submitted at Trial that demonstrated that the Debtor intended to leave Tripp Scott in 2011 or 2012.

## II. CONCLUSIONS OF LAW

### A.      Jurisdiction, Core Proceeding and Venue

The Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b) and 11 U.S.C. § 727. This is a core proceeding for which the Court is authorized to determine all matters regarding this Adversary Proceeding in accordance with 28 U.S.C. § 157(b)(2)(J). Venue is proper in this district pursuant to 28 U.S.C. § 1409.

**B.    The Debtor's interest in the $10 Million Fee is property of the estate under § 541.**

The breadth of the interests captured by § 541's concept of property of the estate cannot be overstated. However, the boundaries, while vast, are not limitless. Courts must consult applicable state law to determine whether a particular property interest is swept into a debtor's bankruptcy estate. The Court concludes that the Debtor's inchoate – but very real – interest in the $10 Million Fee became property of the Debtor's bankruptcy estate pursuant to § 541 on the Petition Date. The case law relied upon by the Debtor in his Trial Brief (ECF No. 92) to support his contrary position is distinguishable for a variety of reasons, and therefore does not guide the Court to the Debtor's conclusion.

**1.    Property of the estate under § 541 is an extremely broad concept and it includes the Debtor's interest in the $10 Million Fee.**

The Bankruptcy Code provides that "the commencement of a case under section 301, 302, or 303 of this title creates an estate." 11 U.S.C. § 541(a). The property of the bankruptcy estate consists of "*all legal or equitable interests of the debtor in property as of the commencement of the case.*" 11 U.S.C. § 541(a)(1) (emphasis added). *See In re Hanley*, 305 B.R. 84, 86 (Bankr. M.D. Fla. 2003) ("This generous provision sweeps into the bankruptcy estate all interests held by the debtor—even future, non-possessory contingent, speculative, and derivative interests.") (citations omitted). The legislative history of § 541(a) reveals that the section's purpose is to include in the

43

estate all kinds of property whether tangible or intangible, including "anything of value that the debtors have."  H.R. Rep. No. 95-595, at 176 (1977).

In construing the meaning of the term "property" as included in a debtor's bankruptcy estate, the Supreme Court and courts throughout the country have repeatedly held that property of the estate includes a debtor's *contingent interests* in property. *See Segal v. Rochelle*, 382 U.S. 375, 379 (1966);[20] *Thomas v. Bender (In re Thomas)*, No. 12-13936, 2013 WL 1579872, at *2-3 (11th Cir. Apr. 16, 2013) (unpublished persuasive decision holding that proceeds of property sale, which stemmed from postpetition sales contract but was contemplated under prepetition option contract, was property of the estate because prior to the petition date the debtor "had more than a mere 'hope, a wish and a prayer" that he might profit" (distinguishing *Bracewell v. Kelley* (*In re Bracewell*), 454 F.3d 1234 (11th Cir. 2006)); *Longaker v. Boston Scientific Corp.*, 715 F.3d 658, 661 (8th Cir. 2013) (noting that § 541 is broad, "encompasses a debtor's contingent interests under a pre-petition [employment] contract," and, consequently, "[a] post-petition payment on a pre-petition contractual interest belongs to the bankruptcy estate"); *Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 750 (3d Cir. 2013) ("[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed"); *but see Bracewell*, 454 F.3d at 1241-42 (11th Cir. 2006) (refusing to apply *Segal* where no property interest existed at petition date, contingent or otherwise,

---

[20]In *Segal*, "the Supreme Court held that the debtors' claim for a loss carry-back tax refund is property of the estate, even though it is contingent when the petition is filed.  There, . . . the debtors asserted that because the refund could not be claimed until the end of the year, it was not property of the estate, but the Supreme Court concluded that this circumstance was not sufficient to take the interest out of the estate. In addition, . . . the debtors argued that certain postpetition events might eliminate the claim altogether, but again the Supreme Court rejected this argument." *Booth v. Vaughan (In re Booth)*, 260 B.R. 281, 285 (B.A.P. 6th Cir. 2001) (summarizing *Segal*).

but rather was created as a result of legislation enacted *after* debtor's bankruptcy filing). "In fact, '[a] contingency is no bar to [a] property interest becoming property of the bankruptcy estate, even if such contingency requires additional postpetition services, and even if the right to enjoyment of the property may be defeated.'" *Prochnow v. Apex Props., Inc. (In re Prochnow)*, 467 B.R. 656, 663 (C.D. Ill. 2012) (quoting *Allen v. Levey (In re Allen)*, 226 B.R. 857, 865 (Bankr. N.D. Ill. 1998)); *see also Longaker*, 715 F.3d at 661 (holding that interest in contingent postpetition payments under employment contract was property of the estate). Interests that are *speculative* are even included within § 541's expansive definition of property of the estate. *See In re Yonikus*, 996 F.3d 866, 869 (7th Cir. 1993) ("[E]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of 11 U.S.C. § 541."). An interest conditioned on continued employment does not exclude it from becoming property of the estate. *In re Lawton*, 261 B.R. 774, 777 (Bankr. M.D. Fla. 2001) (analyzing debtor's interest in stock options and determined they are property of the estate).

Property of the estate also includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, *except such as are earnings from services performed by an individual debtor after the commencement of the case.*" 11 U.S.C. § 541(a)(6) (emphasis added).

"Whether a debtor's interest constitutes 'property of the estate' is a federal question." *Bell-Tel Fed. Credit Union v. Kalter (In re Kalter)*, 292 F.3d 1350, 1353 (11th Cir. 2002). State law generally controls the question of whether the debtor has an interest in property. *Id.* (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)).

Several cases in various jurisdictions have addressed the question of whether a debtor's interest in a postpetition bonus or contingency fee payment constitutes property of the estate.

45

Although numerous factors are applied in making any such determination, the central and repeated question raised in those decisions is whether the postpetition payment is sufficiently grounded in the debtor's prepetition services and rights to qualify as estate property. *See, e.g., In re Riker*, 282 B.R. 724, 725-26 (Bankr. S.D. Fla. 2002) (holding that contingency fee received by debtor-attorney after the petition date related to prepetition legal representation and was entirely included in the debtor's bankruptcy estate) (citing *Jess v. Carey (In re Jess)*, 169 F.3d 1204 (9th Cir. 1999), and *Turner v. Avery*, 947 F.2d 772 (5th Cir. 1991)); *Parks v. Dittmar (In re Dittmar)*, 618 F.3d 1199, 1209-10 (10th Cir. 2010) (finding that the asset at issue was sufficiently rooted in the debtor's pre-bankruptcy past and, thus, property of the estate); *Booth*, 260 B.R. at 289 (characterizing rule as "the nearly unanimous view of the other courts" and collecting cases throughout decision); *In re Soboslai*, 263 B.R. 700, 703 (Bankr. D. Conn. 2001) (same).

In this regard, the decision in *Soboslai* is particularly instructive. *Soboslai* involved a debtor-attorney, who—like the Debtor here—was voted a "member" of his law firm, but did not receive any shares. *Soboslai*, 263 B.R. at 701. There, the debtor-attorney filed his bankruptcy petition in October of 1997 and received a $37,000 postpetition bonus for calendar year 1997. The court held that the portion of the debtor-attorney's bonus that related to prepetition services were property of the estate. *Id.* at 703. In reaching that conclusion, the court found that, as a general matter (and consistent with Tripp Scott's known policies in this case) member bonuses at the debtor-attorney's firm were: (i) paid from firm profits remaining at year-end; (ii) larger than non-member bonuses; and (iii) granted in the discretion of the firm's Board of Directors after consideration of the contributions of each member to the firm over the preceding year, and after a survey of the firm's members as to their proposed allocation of the total bonus pool.

46

Consistent with the foregoing authorities, the $2.7 million bonus awarded to the Debtor here: (i) was based upon the Debtor's years of prepetition work on the Contingency Fee Cases, which led to the prepetition judgments, (ii) was allocated pursuant to Tripp Scott's methodology, (iii) related almost exclusively (if not entirely) to the Debtor's status as an originating Director and as the co-lead trial counsel; and (iv) was derived solely from the $10 Million Fee.

Like the decision rendered in *Soboslai* and other cases finding that postpetition bonuses constitute estate assets, Florida law provides that the Debtor had an interest in a bonus from the $10 Million Fee on the Petition Date, and that interest became property of the estate under § 541. Specifically, in addition to recognizing the enforceability of express contractual obligations (whether written or oral), Florida law also allows for individuals to recover on contracts implied in fact, as well as contracts implied in law. "A contract implied in fact is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from the words of the contract." *Gem Broad., Inc. v. Minker*, 763 So. 2d 1149, 1150 (Fla. 4th DCA 2000) (quoting *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 385 (Fla. 4th DCA 1997)). In contrast to a contract implied in fact, "[a] contract implied in law is a legal fiction, an obligation created by the law without regard to the parties' expression of assent by their words or conduct. The fiction was adopted to provide a remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation." *Id.* at 1151 (quoting *Commerce P'ship*, 695 So. 2d at 386).

In elaborating on this rule, the United States Court of Appeals for the Eleventh Circuit has noted that, under Florida law, "the test of an implied contract of employment is whether services were performed under circumstances fairly raising a presumption that the parties understood and

47

intended that compensation was to be paid." *Eskra v. Provident Life & Accident Ins. Co.*, 125 F.3d 1406, 1413 (11th Cir. 1998) (citing *Tipper v. Great Lakes Chem. Co.*, 281 So. 2d 10, 13 (Fla. 1973)). Recognizing that such contracts "are inferred from the facts and circumstances of the case," the Eleventh Circuit stressed that "where a contract of employment is terminable at will by either the employer or employee, continued employment, in itself, is sufficient consideration to support a promise, express or implied, made during the relationship." *Eskra*, 125 F.3d at 1413 (citing *Coastal Unilube, Inc. v. Smith*, 598 So. 2d 200, 201 (Fla. 4th DCA 1992)).  In determining damages for breach of such an implied contract, that court noted that, "[w]here the existence of a contract is clear, but the terms about how much an employee would receive is unspecified, a jury is empowered to award a reasonable amount of compensation." *Eskra*, 125 F.3d at 1413 (citing *Comty. Design Corp. v. Antonell,* 459 So. 2d 343, 345-46 (Fla. 3d DCA 1984), *review denied*, 469 So. 2d 748 (Fla. 1985)). "The impossibility of the calculation 'with absolute exactness' will not defeat recovery where a long track record of a business provides a solid foundation for reasonable projections." *Eskra*, 125 F.3d at 1413.

Consistent with the foregoing, in *Comty. Design Corp. v. Antonell*, 459 So. 2d 343, 345-46 (Fla. 3d DCA 1984), the Florida Third District Court of Appeal affirmed a jury verdict finding that a draftsman had an enforceable right to a bonus from his employer under an implied contract. Although the employer argued that the purported employment agreement was too indefinite to be enforceable, as the exact amount of the bonus and the degree of completion of work product required for a bonus to be earned were disputed, the Third District Court of Appeal affirmed the employer's obligation to pay, noting, in part, that "[c]ourts are reluctant to hold contracts unenforceable on grounds of uncertainty, especially where, as here, one party has received the benefit of the other's

48

performance." *Id.* at 345 (citing *Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302

So. 2d 404, 408 (Fla.1974); *Burton v. Keaton*, 60 So. 2d 770 (Fla.1952)).  Indeed, as is instructive

here, the court noted as follows:

> "CDC asserts that there was no agreement as to exactly how much
> each employee would receive.  While this is true, *it is necessarily so
> because the bonus was to be divided among those still employed at
> Christmas time and in amounts recommended by Ms. Wooster*. Once
> the drawings were completed, CDC's *contractual duty to act in good
> faith in recommending a bonus for those who qualified arose.  It was
> Wooster's failure to recommend a bonus, and CDC's subsequent
> failure to pay one, which constituted the breach.*  It was appropriate
> for the jury to resolve the compensation question, and the amount
> awarded is reasonable . . . ."

*Comty. Design*, 459 S. 2d at 345 (emphasis added) (citations and quotations omitted).  In further

elaborating on the basis for its decision, the Third District Court of Appeal articulated the weakness

in the argument espoused by the Debtor in this case (and discussed in the section that follows):

> "We are in no way suggesting that employers are not free to establish
> bonus plans like that in *Parrish v. General Motors Corp.*, 137 So.2d
> 255 (Fla. 2d DCA 1962).  *There, the bonus plan gave the employer,
> in writing, the discretion to award, or choose not to award, a bonus.
> Such a writing clearly establishes the employer's intention and does
> not give rise to a contractual bonus right. Here, the contract is oral*
> and the evidence is reasonably susceptible to the conclusion that once
> the drawings were complete the duty to recommend and pay a bonus
> arose."

*Id.* at 345 n.4 (emphasis added); *see also Wyss v Inskeep*, 699 P.2d 1161 (Or. Ct. App. 1985), *review

denied*, 707 P.2d 582 (Or. 1985) (applying analogous contractual principles under Oregon law and

holding that executive was entitled to unpaid bonus, where amount of bonus pool could be

determined by arithmetical calculation, and although allocation of pool to individual employees was

left to discretion of executive committee, exercise of discretion was not unlimited but was subject

to good faith requirement).  Here, Tripp Scott has no written employment agreement or policy giving

the employer the exclusive right to grant or deny a bonus; rather, the firm's President, Mr. Pozzuoli, unambiguously stated that Director compensation specifically included performance bonus awards grounded on the Compensation Committee's analysis of established metrics.

Based upon the foregoing legal principles, the Court concludes that the Debtor had an undeniable interest under Florida law in the $10 Million Fee as of the Petition Date, as exemplified by the $2.7 million the Debtor was ultimately awarded.  Had the Debtor been terminated without receiving any of the $10 Million Fee, which was the product of years of his prepetition efforts, he would have possessed at least one, but most likely more claims against Tripp Scott under Florida law, pursuant to which courts have enforced bonus agreements even in the absence of an express writing.[21]

Courts outside of Florida, in an effort to discern the debtor's rights as of the petition date, have "analogize[d] the bankruptcy petition date as a hypothetical termination date."  *See In re Scotchel*, 491 B.R. 739, 744 (Bankr. N.D. W.Va. 2013).  In  *Scotchel*, for example, the court assessed a debtor-attorney's rights under the theory of *quantum meruit* if a hypothetical termination had occurred on the petition date, and found the debtor-attorney had an interest in a prepetition

---

[21]Had Tripp Scott attempted to deny the Debtor a portion of the $10 Million Fee, the Debtor would have at a minimum had a claim for unjust enrichment.  In Florida, a plaintiff needs to establish the following to sustain a claim for unjust enrichment: (1) a benefit conferred upon a defendant by the plaintiff; (2) the defendant's appreciation of the benefit; (3) the defendant accepted the benefit; and (4) under the circumstances it would be inequitable for him to retain it without paying the value thereof. *Nova Info. Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1006-07 (11th Cir. 2004); *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1314 (11th Cir. 2007).  It is not difficult to comprehend the claim here if the Debtor had not received any portion of the $10 Million Fee from the Contingency Fee Cases he worked on for years, secured the judgments and ultimate fees and forwent prior bonus income.  See, e.g., 1 Williston on Contracts § 4:25 (4th ed.) (noting that, where a promise to pay compensation in addition to a specified sum is too indefinite to create an enforceable agreement, "the existence of the indefinite promise might rebut any assertion that the specified sum was controlling, and might preserve the right to recover to the extent that the reasonable value exceeded the specified sum." (collecting cases)).

contingency fee that was property of the estate. *Id.* The *Scotchel* court disagreed with the debtor-attorney's view that the contingency fee was not property of the estate. *Id.* In support of its holding, the court there stated:

> "Adopting the Debtors [sic] position *would* permit attorneys working on contingent fee basis to file bankruptcy petitions on the eve of settlement and then, postpetition, claim the entire fee for themselves. Such an option would ignore patent economic realities and contravene the intent of the Bankruptcy Code."

*Id.* at 746 (citing *Banner v. Bagen (In re Bagen)*, 201 B.R. 642, 644 (S.D.N.Y. 1996)).

In his Trial Brief, the Debtor argued that – *although he was ultimately awarded a distribution of $2.7 million* – because he hadn't received the money as of the Petition Date his bonus cannot be considered property of the estate in this proceeding and its nondisclosure cannot form the basis for denial of his discharge.[22] *See* 11 U.S.C. § 727(a)(2)(B) (applying to concealment of property of the estate). As set forth above, the law on property of the estate, however, is expansive and does not support the inequitable windfall the Debtor is seeking here.

Unlike the decisions cited by the Debtor in his Trial Brief, the Debtor possessed an interest in the $10 Million Fee on the Petition Date based upon *inter alia*: (i) Tripp Scott's compensation

---

[22]The Debtor cited to *In re Lapi*, No. 04-35831, 2005 WL 3199022, at *2 (Bankr. S.D. Fla. June 29, 2005) to argue his bonus interest was not property of his bankruptcy estate. *Lapi* is factually distinguishable in a number of ways and, thus, not instructive. First, and most obviously, the debtor in *Lapi* is not an attorney and the interest at issue is not the debtor's interest in millions of dollars in fees generated by the debtor. Next, the court there found that the debtor's bonus was not related to his prepetition labors but rather for his continued employment. Here, the $10 Million Fee and the debtor's interest therein all relate to his years of prepetition labor in the Contingency Fee Cases. The evidence shows the Debtor did effectively no work on the Contingency Fee Cases postpetition. Because the bonus at issue here is derived from the $10 Million Fee, which was the fruit of years of the Debtor's prepetition labors, *Lapi*'s logic is entirely distinguishable. Ultimately, even the court in *Lapi* recognized that the debtor there had a contingent interest in the subject bonus on the petition date. *See Lapi*, 2005 WL 3199022 at *2. Thus, even under *Lapi*, the Debtor's *contingent interest* in a bonus from the $10 Million Fee had to be disclosed in his Schedules and SOFA.

51

metrics and the Debtor's status as a Director, an originating Director, and co-lead trial counsel in the Contingency Fee Cases (as discussed in sections I.B.2 and I.L, *supra*); (ii) the fact that the $10 Million Fee was generated by the Debtor's prepetition efforts and he was not awarded significant bonus compensation for years while working on the Contingency Fee cases (as discussed in section I.L, *supra*); and (iii) the fact that denial of a bonus from the $10 Million Fee would have resulted in an actionable claim by the Debtor under Florida law (as discussed above in this section).

> ### 2.    The Debtor's reliance on corporate bonus and crop disaster payment cases was misplaced.

In his Trial Brief, the Debtor primarily relied on two lines of case law to support his argument that his interest in the $10 Million Fee was not property of his bankruptcy estate under § 541.  The first line involved corporate bonus policies and the second line dealt with crop disaster payments.

> #### a.    The corporate bonus cases are inapposite.

The Debtor relied heavily on *Rionda v. HSBC Bank USA, N.A.*, No. 10-20654-CIV, 2010 WL 5476725 (S.D Fla. Dec. 30, 2010), which arose from a suit by a former employee of HBSC over, *inter alia*, a year-end bonus.  The Debtor focused on the fact that, in that case, HSBC retained discretion to award the bonus, which the court in *Rionda* determined rendered the employee's claim for the bonus unenforceable.  The Debtor glosses over the fact that *Rionda* and every other case cited for this proposition fall squarely within the critique identified in *Community Design*, *i.e.*, they involve written bonus plans in which the employer expressly retained sole discretion to award, or choose not to award, a bonus.  *See Rionda*, 2010 WL 5476725 at *1-2 (involving written HSBC policy noting that "[a]ll bonuses are strictly discretionary and may be awarded or not awarded at the sole discretion of the Company," and further providing that "[t]he Company reserves the sole right

to . . . discontinue any . . . bonuses . . . for any reason and without prior notice"); *Seaver v. Klein-Swanson (In re Klein-Swanson)*, 488 B.R. 628, 631 (8th Cir. BAP 2013) (involving written policies at IBM, which the court noted gave IBM "the right to decide it would *not make any award* to the Debtor under either program" (emphasis added)); *In re Chappo*, 257 B.R. 852, 855 (E.D. Mich. 2001) (involving written policies regarding bonus plan at Ford stating that the "Board of Directors at any time may terminate . . . or modify the Plan or suspend any of its provisions," and further providing that the Bonus Plan Committee "may determine in its sole discretion not to make an Award to a particular Participant or group of Participants or to all Participants for any Plan Year."); *Sharp v. Dery*, 253 B.R. 204, 207 (E.D. Mich. 2000) (written bonus policy at communications company "gave the employer discretion *as to whether it would pay any bonus at all*" (emphasis in original)); *Vogel v. Palmer (In re Palmer)*, 57 B.R. 332, 333 (Bankr. W.D. Va. 1986) (written bonus policy at electric company stated that "bonus eligibility does not guarantee anyone a bonus," "and the Company President remains the final authority on the matter of eligibility.").    Here, as discussed above in sections I.B.2. and I.L., <u>supra</u>, the Tripp Scott Compensation Committee did not possess the authority to award the Debtor a bonus from the $10 Million Fee in the amount of zero dollars or terminate the firm's compensation policy for Directors, which the firm President acknowledged included an award of performance bonuses as an express component of Directors' compensation package.  The nature of the discretion possessed by HSBC in *Rionda* and the Tripp Scott's Compensation Committee here is decidedly different.  This difference mandates a dissimilar outcome.

      *Rionda* is distinguishable for another reason.  There, the court found that HSBC employees were paid for their services and, thus, provided no consideration for what would constitute a

gratuitous bonus. *Rionda*, 2010 WL 5476725, at *10. Here, the Debtor's interest in the $10 Million Fee was understood to be a component of his compensation as a Director, which had not been paid, and for which he provided years of service on the Contingency Fee Cases while receiving substantially lower bonuses than the top performing Directors. *See* Section I.L., and Table 1, *supra*. Thus, contrary to the facts of *Rionda*, where the court found the bonus to be extra pay, the Debtor provided Tripp Scott with consideration (work for which he was not fully paid) for the bonus paid out of the $10 Million Fee and that bonus was part of his compensation package.

Finally, *Rionda* does not eliminate the estate's claim for unjust enrichment had Tripp Scott allocated the Debtor a bonus in the amount of zero dollars from the $10 Million Fee or a bonus in an amount far short of the $2.7 million that was awarded. The elements of a claim for unjust enrichment under Florida law would have been easily met, as discussed in section II.B.1, *supra.*

In his Trial Brief, the Debtor suggested that *Seaver v. Klein-Swanson (In re Klein-Swanson)*, 488 B.R. 628 (8th Cir. BAP 2013) "is most analogous to the case at hand."[23] The Court disagrees. The debtor there was employed by IBM. As noted above, IBM maintained certain types of bonuses that employees could receive if certain conditions were met. The written bonus policies at issue in that case permitted IBM to withhold awards entirely. There was no evidence that IBM decided to make any bonus awards to the Debtor. The bonuses were paid from IBM's coffers, which contained funds not directly generated by the debtor.

Here, the $10 Million Fee was incontrovertibly tied directly to the Debtor's prepetition labors in working up the cases, taking them to trial and winning at trial. The evidence at Trial showed that

---

[23]The Court notes that the Debtor could not have relied upon *Klein-Swanson* when preparing his Schedules and SOFA because the BAP for the Eight Circuit decided the case on March 22, 2013 and the Debtor filed his Schedules on March 20, 2012.

the Tripp Scott Compensation Committee could not fail to award the Debtor a bonus from the $10 Million Fee. The Pozzuoli Prepetition E-mails and McLaughlin Prepetition E-mails demonstrate that the process concerning allocating bonuses from the $10 Million Fee was well contemplated on the Petition Date. The amount of the bonus pool was known on the Petition Date. Tripp Scott's past practices demonstrated that bonuses were awarded on a consistent basis. Unlike IBM's income, the $10 Million Fee was going to be distributed to the employees of Tripp Scott given the nature of Tripp Scott's business. Thus, if no money from the $10 Million Fee was allocated to the Debtor, it would have been allocated to other Tripp Scott employees. This was certainly not the case at IBM, as set forth in *Klein-Swanson*.

The nature of the businesses in the cases relied upon by the Debtor render the holdings in those cases inapplicable. In his Trial Brief in the property of the estate section of his arguments, the Debtor did not rely upon one case where the debtor was an attorney or similar professional. Tripp Scott, while a professional corporation, does not operate like HSBC, IBM, Ford, or a communications, planning or electric company.[24] It is not difficult to understand the difference between Tripp Scott, a law firm organized under Florida law as a subchapter C corporation, and the foregoing companies regarding bonus polices. Moreover, the employees' labors in the cases cited

---

[24]*See Rionda v. HSBC Banks US*, 2010 WL 5476725 (S.D Fla. Dec. 30, 2010) (debtor worked at HSBC); *In re Klein-Swanson*, 488 B.R. 628 (8th Cir. BAP 2013) (debtor worked at IBM); *In re Chappo*, 257 B.R. 852 (E.D. Mich. 2001) (debtor worked at Ford); *Sharp v. Dery*, 253 B.R. 204 (E.D. Mich. 2000) (debtor worked at a communications company); *In re Lapi*, 2005 WL 3199022, (Bankr. S.D. Fla. June 24, 2005) (debtor worked at a planning company); *Vogel v. Palmer (In re Palmer)*, 57 B.R. 332 (Bankr. W.D. Va. 1986) (debtor worked at an electric company). While the Debtor relied upon the foregoing cases to support his position that his interest in the $10 Million Fee was not property of the estate, those cases do not represent the only view of. For example, in *In re Miller*, No. 10-15891, 2011 WL 3741846, at *3-4 (Bankr. N.D. Ohio Aug. 24, 2011), the court found that the debtor's rights under a discretionary bonus policy at Lincoln Electric Company were property of the estate. The court in *Miller* declined to follow *Sharp* and *Palmer,* rather, the court chose to follow the reasoning of the BAP in *Booth*. *Id.* at *4.

by the Debtor did not directly relate to the source of the funds from which the bonuses were paid. Based upon the foregoing, the corporate bonus cases relied upon by the Debtor in his Trial Brief are not relevant to and do not inform the Court's conclusion that the Debtor's interest in the $10 Million Fee became property of the estate pursuant to § 541 on the Petition Date.

<strong>b.      The crop disaster payment cases are readily distinguishable.</strong>

In his Trial Brief, the Debtor relied on *Bracewell v. Kelley (In re Bracewell)*, 454 F.3d 1234 (11th Cir. 2006) and *Drewes v. Vote (In re Vote)*, 276 F.3d 1024 (8th Cir. 2002).  These cases related to congressional acts concerning crop disaster payment legislation, which are acts of Congress that provide monetary assistance to farmers who had suffered losses to their crops for certain years for certain reasons.  As with the corporate bonus cases discussed above, the crop disaster payment cases do not lead the Court to the Debtor's conclusion that the Debtor's interest in the $10 Million Fee was not property of the estate.

In *Bracewell*, the United States Court of Appeals for the Eleventh Circuit addressed the question of whether the crop disaster payments to the debtor as a result of congressional legislation were property of the debtor's estate.  The Eleventh Circuit determined that the debtor's property interest in claims to payment under the operative law "did not come into existence until the legislation itself became law, which was after his bankruptcy petition had been filed."  *Bracewell*, 454 F.3d at 1237-39.

In both *Bracewell* and *Vote*, the legislation upon which the postpetition payments to the debtor were based had not been enacted on the dates on which the debtors filed for bankruptcy. Unlike the crop disaster legislation at issue in those cases, which had not become law on or before the petition dates in *Bracewell* and *Vote*, the Debtor had an undeniable interest in the $10 Million

56

Fee as of the Petition Date.  The judgments in each of the Contingency Fee Cases had been entered (and affirmed and mandated in the Home Depot Case) prior to the Petition Date.  Moreover, as the Brown Settlement E-mails showed, the resolution of the Contingency Fee Cases was virtually substantively finalized prior to the Petition Date.[25]

Similarly, while the exact value of the Debtor's interest in the $10 Million Fee was unknown on the Petition Date because the amount of the $10 Million Fee he was to receive was ultimately to be determined by the Compensation Committee, Tripp Scott's compensation system existed prior to and on the Petition Date.  Under the Tripp Scott compensation system, the Debtor had an interest in the $10 Million Fee based upon the fact that he was a Director of the firm and co-lead trial counsel on the Contingency Fee Cases.  He had worked substantial hours on the two cases, and that he was co-originating counsel, which meant that he was going to receive client generation credit.  Moreover, the Pozzuoli Prepetition E-mails and the McLaughlin Prepetition E-mails show that the Debtor had an interest in the $10 Million Fee and the only question on the Petition Date was how much of the $10 Million Fee was going to be awarded to the Debtor.[26]  As discussed in the Findings of Fact, Tripp Scott had never failed to award a bonus to a Director who was alive and employed at the time the bonus was awarded if there were bonus funds to distribute.  Moreover, there was no evidence adduced at Trial that even hinted to the fact that the Debtor was going to be terminated or

---

[25]Indeed, had the settlement negotiations broke down and the $10 Million Fee not been paid, the Debtor's interest in the $10 Million Fee would have turned out to be zero, but that result does not vitiate the estate's interest.  Based upon the evidence at Trial, if the $10 Million Fee was paid into Tripp Scott, the Debtor's interest in the $10 Million Fee was definitely worth something more than zero, and ultimately turned out to be worth $2.7 million.

[26]The lowest figure in evidence concerning the Debtor's bonus from the $10 Million Fee was the $2 million figure from Mr. Pozzuoli referred to in the McLaughlin Prepetition E-mails.

that he was going to resign prior to the $10 Million Fee being disbursed.[27]

The holdings in *Bracewell* and *Vote* are factually distinguishable and, as a result, their holdings are not controlling. On the Petition Date, the Debtor here did not have only a hope that he would be paid. Rather, he knew he would be paid a substantial sum from the $10 Million Fee and both hoped and expected it would be in the millions of dollars. *See In re Thomas*, 2013 WL 1579872, at *2 (distinguishing *Bracewell* and affirming finding that the debtor had an interest in certain sale proceeds stemming from a prepetition option contract).

### C.    The Debtor's discharge is denied for concealing property of the estate with the intent to hinder delay or defraud creditors, making false oaths or accounts and transferring estate property within one year prior to the Petition Date with the intent to hinder delay or defraud creditors.

In the Amended Complaint (ECF No. 39), the Plaintiffs alleged that the Debtor's discharge should be denied because he: (i) intentionally and fraudulently concealed estate property after the Petition Date;[28] (ii) intentionally transferred property of the Debtor prior to the Petition Date;[29] and (iii) knowingly and fraudulently made false oaths or accounts in connection with his Chapter 7 case.[30] The Debtor had no affirmative defenses at Trial.[31]

---

[27]The evidence at Trial supports the opposite conclusion. Given that the judgments in the Contingency Fee cases were the Debtor's largest trial victories ever and that his bonuses from 2008 to 2011 were substantially less than other top performing Directors in terms of client generations and work revenue, the Debtor was not going to leave Tripp Scott prior to receiving his distribution from the $10 Million Fee.

[28]*See* 11 U.S.C. § 727(a)(2)(B) (Counts I and II).

[29]*See* 11 U.S.C. § 727(a)(2)(A) (Count III).

[30]*See id.* at § 727(a)(4)(A) (Counts IV and V).

[31]The affirmative defense asserted by the Debtor in the Answer to the Amended Complaint was stricken by Court order based upon concession by the Debtor (ECF No. 66).

Based upon the foregoing Findings of Fact, as discussed below, the Court concludes that the Debtor's discharge is denied because the Plaintiffs have met their burden at Trial on all of the Counts in the Amended Complaint.

> **1.     The Debtor's conduct in this case runs contrary to the principles underlying the privilege of a discharge in a Chapter 7 case.**

Discharges in bankruptcy, which provide a "fresh start," are exclusively for honest but unfortunate debtors. *Gary J. Rotella & Assocs. v. Bellassai (In re Bellassai)*, 451 B.R. 594 (Bankr. S.D. Fla. 2011) (citing *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007)); *see also Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999). "[T]he debtor has no fundamental right to a discharge." *In re Scott*, 172 F.3d at 966. "The general policy that provisions denying a discharge are construed liberally in favor of the debtor and against the creditor applies only to the honest debtor." *Jennings v. Maxfield (In re Jennings)*, 533 F.3d 1333, 1338-39 (11th Cir. 2008). "Though the Bankruptcy Code provides most debtors with a fresh start, the Code prevents dishonest debtors from improperly using it as a shield." *E. Diversified Distribs., Inc. (In re Matus)*, 303 B.R. 660, 670 (Bankr. N.D. Ga. 2004). It is settled that a party objecting to a debtor's discharge bears the burden of proof under the preponderance of the evidence standard at trial. *Grogan v. Garner*, 498 U.S. 279, 291 (1991) (determining preponderance of the evidence standard applied in a § 523 action); *Menotte v. Hahn (In re Hahn)*, 362 B.R. 542, 546 (Bankr. S.D. Fla. 2007) (stating standard in a § 727 action).

To receive the *privilege* of a discharge, the debtor must provide complete financial disclosure. *In re Scott*, 172 F.3d at 967. After full and fair disclosure, "[c]reditors are entitled to judge for themselves what will benefit, and what will prejudice them." *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984).

59

Contrary to the principles underlying the Bankruptcy Code, based upon the Findings of Fact set forth above, the Court concludes the Debtor here is: (i) *dishonest*, rather than honest; (ii) *fortunate*, as opposed to unfortunate; and (iii) seeking a *head start*, not a fresh start.  The Debtor purposefully concealed a multi-million dollar interest that was property of the estate with the intention of keeping all of the money paid to him as a result of his prepetition interest in the $10 Million Fee.  Because the Debtor failed to provide a scintilla of evidence in his Schedules that would lead creditors and Trustee Welt to his interest in the $10 Million Fee, he cannot obtain a discharge that would enable him to shield the concealed asset.

> **2.     The Debtor concealed his interest in the $10 Million Fee and the Transfers in his Schedules and SOFA with the intent to hinder, delay and defraud his creditors and Trustee Welt.**

To prevail on a claim under § 727(a)(2)(B), a plaintiff must show by preponderance of the evidence that: (1) there was a transfer or concealment; (2) after the filing of the petition; (3) of property of the estate; and (4) by the debtor with the intent to hinder, delay or defraud his creditors.  *See Menotte v. Cutaia (In re Cutaia)*, 410 B.R. 733, 738 (Bankr. S.D. Fla. 2008). A plaintiff is not required to show the transfer or concealment caused harm.  *In re Scott*, 172 F.3d at 968; *In re Snyder*, 152 F.3d 596, 601 (7th Cir. 1998).  "Section 727(a)(2) is intended to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of assets."  *Menotte v. Davis (In re Davis)*, 363 B.R. 614, 619 (Bankr. M.D. Fla. 2006).  "'Concealment' occurs when a debtor's interest in the property is not obvious, but the debtor continues to reap the benefits the property has to offer."  *Kapila v. Dailey (In re Dailey)*, 405 B.R. 386, 392 (Bankr. S.D. Fla. 2009) (citing *Johnson v. Greene (In re Greene)*, 340 B.R. 93, 98 (Bankr. M.D. Fla. 2006)).  Omissions in bankruptcy schedules and statements of financial affairs constitute

60

concealment where the omission is fraudulent and material. *In re Dailey*, 405 B.R. at 392 (citing *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991)). An omission is material if it "bears a relationship to the bankrupt's business transactions or estate or concerns the discovery of assets, business dealings or the existence and disposition of his property." *In re Chalik*, 748 F.2d at 618. To be fraudulent, omission of the information is intended to go unnoticed by the Chapter 7 Trustee. *In re Dailey*, 405 B.R. at 392. Debtors in bankruptcy must fully disclose all transfers, even if the money is not available to creditors at the time of filing. *Morrissy v. Dereve (In re Dereve)*, 381 B.R. 309, 329 (Bankr. N.D. Fla. 2007).

Elements (1) and (2) of a § 727(a)(2)(B) claim require proof of a transfer or concealment after the filing of the petition. Here, the Trial evidence demonstrates these factors are satisfied. The Debtor's Schedules and SOFA provide no information concerning the Debtor's interest in the $10 Million Fee or disclose anything relating to the Transfers. The Debtor's interest in the $10 Million Fee related to his business dealings and concerned discovery of assets. The Debtor omitted reference to his interest in the $10 Million Fee and the Transfers intentionally so that his creditors and Trustee Welt would not discover this asset. The omissions were not the result of a mistake. The Debtor's interest in the $10 Million Fee and the Transfers were not obvious, and he intended to, and most likely would have, reaped the benefits of his interest in the $10 Million Fee and the Transfers but for the actions of CIB Marine and Trustee Welt in bringing this Adversary Proceeding. *See In re Dailey*, 405 B.R. at 392. Moreover, the Debtor's Schedules and SOFA were filed on March 20, 2012, approximately one month after the Petition Date. The Court concludes that there was concealment after the Petition Date when the Debtor did not disclose his interest in the $10 Million Fee or the Transfers in his Schedules and SOFA.

Element (3) of a § 727(a)(2)(B) claim is met here because the Debtor's interest in the $10 Million Fee is property of the estate for the reasons set forth in section II.B.1, *supra*, which are incorporated herein. Equally, the funds that were the subject of the Transfers were also property of the estate because they were transfers of money the Debtor owned in an investment account, as set forth in the Pretrial Stipulation, the Debtor's testimony at Trial and Exs. 13-14.

Element (4) of a § 727(a)(2)(B) claim is established because the Court concludes that, based upon the evidence at Trial, the Debtor acted with the intent to hinder, delay or defraud his creditors and Trustee Welt when he concealed his interest in the $10 Million Fee and the Transfers on his Schedules and SOFA. It is widely recognized that it is extremely unlikely that a debtor will confess to acting with intent to hinder, delay or defraud a creditor or the trustee. *See In re Jenning*, 533 F.3d at 1338-39; *see also Job v. Calder (In re Job)*, 907 F.2d 953, 955-56 (10th Cir. 1990). As a result, courts analyze the totality of the circumstances and rely upon the badges of fraud to determine whether actual fraudulent intent exists. *See In re Jenning*, 533 F.3d at 1338-39. Under this standard, based upon the Court's findings in section I.J., *supra*, the Court concludes that the evidence at Trial shows that the Debtor acted with intent to hinder, delay or defraud his creditors, including CIB Marine and Trustee Welt. *See* Section I.J., *supra*.

The Debtor concealed his interest in the $10 Million Fee hoping this would lead to a discharge of his prepetition debts, including the $4.5 million CIB Marine Judgment, and the retention of the multi-million dollar bonus he expected to receive from the $10 Million Fee. This maneuver demonstrates classic concealment with the intent to hinder, delay or defraud his creditors and Trustee Welt. The Debtor sought to obtain the ultimate windfall through his concealment. This strategy is not original. Concealment cases under § 727 often involve a debtor's attempt to conceal

62

a prepetition asset with the hope of receiving the benefit of a discharge while retaining the concealed asset or the fruits therefrom.  In *Dailey*, this Court stated, "I find that there was a motive for this debtor, as there is for any dishonest debtor, not to disclose prepetition accounts and assets that generate postpetition cash . . . "  *Dailey*, 405 B.R. at 391.  The Court concludes the Debtor here shared the motivation of the debtor in *Dailey*.  As in *Dailey*, the Court concludes that the elements of § 727(a)(2)(B) are met and the Debtor's discharge is denied for concealment with the intent to hinder, delay or defraud creditors and Trustee Welt.  The facts of this case are more egregious than the facts presented in *Dailey*, however, as the Debtor here attempted to conceal a *multi-million dollar interest* that was property of the estate.

The Debtor's level of sophistication, which is discussed in the Findings of Fact, supports the Court's conclusion that his concealment of his interest in the $10 Million Fee and the Transfers was done with the intent to hinder, delay or defraud his creditors and Trustee Welt.  *See In re Dailey*, 405 B.R. at 391; *In re Cutaia*, 410 B.R. at 739; *Jensen v. Groff (In re Groff)*, 216 B.R. 883, 887 (Banrk. M.D. Fla. 1998) ("The fact that the Debtor's omissions were intentional is supported by the fact that the Debtor is a sophisticated businessman.").

The Debtor's testimony at Trial concerning the legal research he conducted that he believed supported omitting his interest in the $10 Million Fee from his Schedules and SOFA also establishes his intent to hinder, delay or defraud his creditors.  It shows that the Debtor knew he had the interest in the $10 Million Fee, knew disclosing the interest would be problematic and desired to omit the interest from his Schedules and SOFA.  As discussed above in section II.B.1., the Debtor's legal conclusion was wrong.  Rather than researching a means to conceal his interest in the $10 Million Fee, the Debtor should have focused on the well-established disclosure requirements under § 521.

63

In the course of the Debtor's legal research concerning whether disclosure of his interest in the $10 Million Fee needed to be made on his Schedules and SOFA, the Debtor presumably did not read, or chose to ignore, the cases that hold the Debtor is not the gatekeeper concerning disclosure on his Schedules and SOFA.

"'It is not for the debtor to decide what is and is not relevant.  A debtor who omits important information and fail[s] to make full disclosure, place[s] the right to a discharge in serious jeopardy.'" *Matus*, 303 B.R. at 675 (citations omitted); *see also Dereve*, 381 B.R. at 333 (finding that full and accurate disclosure is required when an individual files for bankruptcy); *Rutland v. Petersen (In re Petersen),* 323 B.R. 512, 517 (Bankr. N.D. Fla. 2005) ("Debtors must make full and complete disclosures on their bankruptcy schedules, and it is not up to a debtor to decide upon the relevance or value of assets or information before including it on his or her schedules."); *Stone v. Bosse (In re Bosse)*, 200 B.R. 419, 421 (Bankr. S.D. Fla. 1996) ("A debtor in bankruptcy has an obligation to disclose the existence of all assets, even if they are worthless or unavailable."); *In re Prochnow*, 467 B.R. at 666 ("Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or unavailable to the bankruptcy estate."); *Lewis v. Summers (In re Summers)*, 320 B.R. 630, 647 (Bankr. E.D. Mich. 2005) ("It is not up to the Debtor to decide whether or not to list property based upon his belief as to value. . . . 'If there is any doubt or uncertainty whatsoever as to a possible interest in any property, the asset should be scheduled with an appropriate explanation . . . .'" (citations omitted)); *Fokkena v. Tripp (In re Tripp)*, 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998) ("It is not for debtors to determine what assets or transactions should be disclosed; debtors must report all property interests, even if they are worthless or unavailable to creditors."). If the Debtor read these cases, he certainly ignored their obvious applicability and

intentionally chose not to be guided by their holdings at his own peril. Had he heeded their holdings, the Debtor would have disclosed his interest in the $10 Million Fee and likely would not have been a party to this Adversary Proceeding. The Debtor's violations of the plain disclosure requirements regarding his Schedules and SOFA further support the Court's conclusions that the Debtor concealed his interest in the $10 Million Fee with the intent to hinder, delay or defraud his creditors and Trustee Welt.

Based on the foregoing authorities, the Debtor's interest in a bonus from the $10 Million Fee was a contingent estate asset as of the Petition Date that was concealed from Schedule B of the Debtor's Schedules, which were filed after the Petition Date for the sole and exclusive purpose of hindering, delaying and defrauding his creditors and Trustee Welt. *See* 11 U.S.C. § 727(a)(2)(B).

The Debtor's misrepresentations on Schedule I provide an independent basis for denying his discharge. Specifically, the evidence showed that the Debtor filed his Chapter 7 case with the expectation of receiving a multi-million dollar bonus from Tripp Scott in 2012 but only disclosed on Schedule I that he anticipated an "[a]nnual performance bonus (historically 65,000 – 70,000)." *See* Bankr. ECF No. 14. The evidence at Trial, which is discussed at section I.F., *supra*, demonstrates this statement is flatly untrue. Indeed, the failure to provide disclosure consistent with the Debtor's repeatedly stated expectations—as set forth in numerous prepetition e-mails that are part of the record in this case—is consistent with and wholly supportive of the conclusion that the Debtor's disclosure on Schedule I was not merely incorrect, but specifically intended to conceal his bonus on Schedule B. This misstatement, standing alone, is sufficient to result in the loss of the Debtor's discharge. *See Thomson v. Glenn (In re Glenn)*, 335 B.R. 703, 707-08 (Bankr. W.D. Mo. 2005) (stressing that "without engaging in a fair amount of detective work—which neither a court,

65

trustee, nor creditor is required to do—the Debtor's true income simply cannot be ascertained from a review of his schedules," and denying debtor's discharge under 727(a)(4) of the Bankruptcy Code based upon intentional failure to disclose significant bonus income on Schedule I); *see also Wisell v. Wisell (In re Wisell)*, No. 05-1044, 2006 WL 1932334, at *4 (Bankr. D. Vt. June 30, 2006) (denying debtor's discharge under 727(a)(4) of the Bankruptcy Code for misrepresentations on Schedule I, including failure to disclose anticipated severance package and other post-termination income).

The Debtor did not present any evidence at Trial from which the Court concludes that he should receive a discharge notwithstanding his intentional and fraudulent concealment of his interest in the $10 Million Fee and the Transfers. *See In re Cutaia*, 410 B.R. at 739 (determining that once the evidence is presented that proves a debtor's discharge should be denied, the burden shifts to the Debtor to present evidence that sufficiently explains why he nevertheless should receive a discharge). The closest evidence the Debtor presented concerning an explanation as to why he nevertheless should receive a discharge was his own testimony concerning the legal research he did in connection with completing his Schedules and SOFA. As discussed above, it was not the Debtor's place to determine what he believed was or was not property of the estate and then make his disclosures based upon his self-serving views. The Court concludes the Debtor's justification for his concealment did not rebut the Plaintiffs' evidence at Trial, which demonstrated he concealed his interest in the $10 Million Fee with intent to hinder, delay, or defraud his creditors.

The facts borne out at Trial show the Debtor acted with intent to hinder, delay or defraud his creditors and Trustee Welt when he concealed his interest in the $10 Million Fee and the Transfers in his Schedules and Statement of Financial Affairs after the Petition Date. Therefore, the Debtor's

66

discharge is denied based upon § 727(a)(2)(B).  *See In re Carlson*, 263 F.3d 748 (7th Cir. 2001)(affirming denial of discharge where debtor-attorney fraudulently concealed interest in contingent fee case).

### 3.    The Debtor made false oaths or accounts on his Schedules and SOFA.

The purpose of § 727(a)(4) is to ensure that a debtor provide the Chapter 7 trustee and the creditors with reliable information in order to assist the trustee in administration of the estate.  *See In re Cutaia*, 410 B.R. at 741; *Day v. Zwirn (In re Zwirn)*, No. 05-1036, 2005 WL 1978510, at *5 (Bankr. S.D. Fla. Aug. 15, 2005); *see also Baron v. Klutchko (In re Klutchko)*, 338 B.R. 554, 568 (Bankr. S.D.N.Y. 2005).  The "Debtor had an obligation to truthfully disclose all of his assets and answer all questions in his Bankruptcy Schedules."  *Cadle Co. v. Stasch (In re Stasch)*, No. 05-2103, 2008 WL 877209, at *10 (Bankr. S.D. Fla. Mar. 31, 2008).  The goal of § 727(a)(4)(A) is to facilitate administration of Chapter 7 bankruptcy cases without the need for parties in interest to expend resources to confirm the veracity of the debtor's bankruptcy documents.  *See Friedman v. Kaiser* (*In re Kaiser*), 94 B.R. 779, 781 (Bankr. S.D. Fla. 1998); *see also Epic Aviation, LLC v. Phillips (In re Phillips)*, 418 B.R. 445, 461 (Bankr. M.D. Fla. 2009) (recognizing that § 727(a)(4)(A)'s "purpose is to ensure that 'those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs.'").  Dishonesty in connection with a debtor's bankruptcy schedules and statement of financial affairs comes with a price, and that price is denial of the debtor's discharge.  In short, the prohibitions and consequences set forth in § 727(a)(4)(A) are the teeth to the § 521 disclosure requirements.

To prevail on a claim under § 727(a)(4), a plaintiff must establish that: (1) the debtor made a material false oath, and (2) the false oath was made knowingly and fraudulently.  *See Swicegood*,

924 F.2d at 232; *In re Cutaia*, 410 B.R. at 741.  Deliberate omissions in the Debtor's Schedules and SOFA constitute false oaths or accounts and are sufficient to deny his discharge under § 727(a)(4). *See Bakst v. Reis (In re Reis)*, 372 B.R. 521, 525 (Bankr. S.D. Fla. 2007); *In re Davis*, 363 B.R. at 620.  "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transaction or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."  *In re Chalik*, 748 F.2d at 618.

Based upon the evidence presented at Trial, the Debtor's Schedules and SOFA do not contain accurate information.  As discussed above in section II.C.2, *supra*, the Debtor did not disclose his interest in the $10 Million Fee or the Transfers in his Schedules and SOFA.  Specifically, the Debtor knew he had at least a contingent interest in the $10 Million Fee, which should have been disclosed in response to No. 21, Schedule B, alongside the potential tort claims against Stearns Weaver and CIB Marine.  The Debtor's interest in the $10 Million Fee also could have been disclosed in response to Nos. 19 or 35, Schedule B.  Further, the Debtor failed to disclose his interest in the $10 Million Fee in his Schedule I on March 20, 2012, while (completely unbeknownst to his creditors or Trustee Welt) the Debtor vigorously advocated for his right to a multimillion-dollar bonus from the $10 Million Fee.  He was fully aware that Tripp Scott had received its full fees from the Security Mutual Case and the Home Depot Case on March 1, 2012 and March 13, 2012, respectively. Accordingly, he reasonably anticipated (consistent with his prepetition communications) that his income would increase dramatically within the year following March 20, 2012, but opted to keep that information to himself and affirmatively misled all parties and the Court as to what he "reasonably anticipated," as contrary to what is required by Schedule I.  These knowing and intentional omissions were made under oath in his Schedules and SOFA.

The Debtor's failure to disclose his interest in a bonus from the $10 Million Fee and the Transfers unquestionably meets the materiality standard articulated by the Eleventh Circuit in *Chalik*. The Debtor's interest in the $10 Million Fee is material in the § 727(a)(4)(A) context. Based upon that interest, Tripp Scott awarded the Debtor a $2.7 million bonus which he had earned for his years of prepetition labor on the Contingent Fee Cases. Standing alone, that bonus is significantly more valuable than the total of all other estate assets in the Debtor's case. Moreover, the $10 Million Fee was derived from the Contingency Fee Cases stemmed directly from the Debtor's business of the practice of law. The Debtor testified at Trial the information contained in his Schedules and SOFA was provided intentionally and not the result of a mistake. The false oaths or accounts relating to the Transfers are also material in regards to § 727(a)(4)(A) because they bear directly on the existence and disposition of the Debtor's property.

The facts that support the Debtor's intent to hinder, delay or defraud his creditors and Trustee Welt for § 727(a)(2) purposes are discussed at Section I.J., *supra*, are incorporated herein and apply to the Plaintiffs' § 727(a)(4) claim. Accordingly, the Debtor's discharge is denied based upon § 727(a)(4)(A).

### 4.       The Debtor made Transfers with the intent to hinder, delay or defraud his creditors within the year prior to the Petition Date.

In addition to the postpetition concealment and false oath claims relating to the $10 Million Fee and the Transfers set forth in section II.B.2-3, the Court concludes that denial of the Debtor's discharge also results from the Debtor's effectuation of the pre-petition Transfers under § 727(a)(2)(A).

The Pretrial Stipulation filed with the Court in this Adversary Proceeding and the Debtor's testimony at Trial unambiguously provides that the Transfers were made within the ninety days prior

to the Petition Date, resulted in pre-petition transfers to accounts wherein the Debtor did not have an ownership interest, and were not disclosed anywhere on the Debtor's Schedule or Statement of Financial Affairs.

The evidence at Trial, as discussed at length herein, revealed that the Transfers were effectuated and concealed by the Debtor with the intent to hinder, delay or defraud creditors and, thus, provides additional grounds for the denial of the Debtor's discharge in this case.

Based upon the foregoing, it is **ORDERED**:

1.    Pursuant to 11 U.S.C. § 541 and under applicable Florida law, the Debtor's interest in the $10 Million Fee, which was determined by Tripp Scott to be $2,700,000 gross and approximately $1,700,000 net after the amounts withheld for taxes by Tripp Scott, is property of the Debtor's bankruptcy estate.

2.    Pursuant to 11 U.S.C. § 727(a)(2)(B), the Debtor's discharge is **DENIED** based upon his concealment of his interest in the $10 Million Fee and the Transfers with the intent to hinder, delay or defraud his creditors and Trustee Welt after the Petition Date**.**

3.    Pursuant to 11 U.S.C. § 727(a)(4)(A), the Debtor's discharge is **DENIED** based upon his false oaths in his Bankruptcy Schedules and Statement of Financial Affairs relating to his interest in the $10 Million Fee and the Transfers.

4.    Pursuant to 11 U.S.C. § 727(a)(2)(A), the Debtor's discharge is **DENIED** based upon the Transfers, which were done with the intent to hinder, delay or defraud his creditors and Trustee Welt, within one year before the Petition Date.

5.    The Court will enter a separate judgment pursuant to Bankruptcy Rule 9021 and in conformity with Bankruptcy Rule 7054.

70

# # #

*The Clerk is directed to provide copies to counsel of record.*